RUSS AUGUST & KABAT
Marc A. Fenster (CA SBN 181067)
mfenster@raklaw.com
Reza Mirzaie (CA SBN 246953)
rmirzaie@raklaw.com
Paul A. Kroeger (CA SBN 229074)
pkroeger@raklaw.com
Neil A. Rubin (CA SBN 250761)
nrubin@raklaw.com
12424 Wilshire Boulevard, 12th Floor
Los Angeles, California 90025
(310) 826-7474 - Telephone
(310) 826-6991- Facsimile

*Attorneys for Plaintiff*
Oyster Optics, LLC.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| OYSTER OPTICS, LLC,<br><br>   *Plaintiff,*<br><br> v.<br><br>CIENA CORPORATION,<br><br>   *Defendant*. | Case No. 4:17-cv-05920-JSW<br><br>**PLAINTIFF OYSTER OPTICS, LLC'S CLAIM CONSTRUCTION PRESENTATION SLIDES**<br><br>**FILED PURSUANT TO THE COURT'S ORDER RE TENTATIVE RULINGS AND QUESTIONS RE MARKMAN HEARING (ECF NO. 113)** |

RUSS AUGUST & KABAT

Plaintiff Oyster's Claim Construction Presentation

# Oyster Optics, LLC, v. Ciena Corporation

Case No. 4:17-cv-05920-JSW

United States District Court
Northern District of California

July 23, 2020

# "the optical signals"
## ('327 Patent at Claims 1, 14, 25, 36)

Court's Tentative Construction: "the optical data signals received on the fiber input from the second optical fiber"

# Differences Between The Court's Tentative and Ciena's Construction

| Court's Tentative | Ciena |
|---|---|
| "the optical data signals received on the fiber input from the second optical fiber" | "**transmitting optical signals**" is the antecedent basis for "the optical signals" |

4

1. A transceiver card for a ==telecommunications== box for transmitting data over a first optical fiber and receiving data over a second optical fiber, the card comprising:

a transmitter ==for transmitting data over the first optical fiber,== the transmitter having a laser, a modulator, and a controller receiving input data and controlling the modulator as a function of the input data, ==the transmitter transmitting optical signals== for telecommunication as a function of the input data;

a fiber output optically connected to the laser for connecting the first optical fiber to the card;

a fiber input for connecting the second optical fiber to the card;

a receiver optically connected to the fiber input ==for receiving data from the second optical fiber;== and

an energy level detector ==optically connected between the receiver and the fiber input to measure an energy level of the optical signals,== wherein the energy level detector includes a plurality of thresholds.

- "**Telecommunication**" is over a distance between two transceivers, not loop-back.

- Signals travel over **different** optical fibers

  - Transmit – *first* optical fiber

  - Receive – *second* optical fiber

- Energy level detector between receiver and fiber input can only be measuring optical signals from second optical fiber

5

# Oyster's Proposal Consistent With Patent Disclosure



**First optical fiber**

**Second optical fiber**

Figure 2

6

# Ciena's Transceiver-Connected-To-Itself Theory Excludes *All Embodiments*



**First optical fiber**

**Second optical fiber**

Figure 2



Excluding embodiments "is rarely, if ever, correct."

*SanDisk Corp. v. Memorex Products, Inc.,* 415 F.3d 1278, 1285 (Fed. Cir. 2005).

(1) How does the remainder of the prosecution history inform the "optical signals" construction? In particular:

    a. Following the claim amendment that added the disputed limitation, the examiner rejected the claims over U.S. Patent No. 7,099,592 to Snawerdt. (May 11, 2009 Rejection.) Does Snawerdt describe measuring the energy of the transmitted optical signal or the received?

    b. The '511 Patent is a continuation of the '327 Patent and has the same specification. The parties agree that the term "the optical signals" in the '511 Patent refers to "the optical signal transmitted by the transmitter." Does Oyster contend that these claims are inoperable or exclude preferred embodiments?

(2) Claims 9 and 33 of the '327 Patent describe the thresholds in the energy level detector "bound[ing] an acceptable energy range for the *received* light." Can these claims be reconciled with Ciena's construction?

May 11, 2009 Rejection over Snawerdt '592 patent:

2.    Claims 34, 36-38, 43, 45, 47-49 and 54-57 are rejected under 35 U.S.C. 102(e) as being anticipated by Snawerdt US Patent no. 7,099,592.

an energy level detector 33 optically connected between the receiver and the fiber input to measure an energy level of the optical signals, the energy level detector includes a threshold indicating a drop in amplitude of a phase modulated signal (col. 4, lines 49-55).

May 11, 2009 Rejection over Snawerdt '592 patent:



Faceplate **9** may have a fiber connector **109**, such as a duplex SC connector, for connecting to an output fiber **110** and an input fiber **111**. Alternately, a single fiber for inputting and outputting signals could be provided.

'592 patent at 4:7–10

Fig. 1

10

# Prosecution History Supports the Tentative Construction

May 11, 2009 Rejection over Snawerdt '592 patent:



Fig. 2

FIG. **2** shows the card **1** of the present invention in more detail. A transmitter **10** transmits signals over optical fiber **110** (FIG. **1**). Transmitter **10** includes a single laser **12**, for

'592 patent at 4:11–12

Optical signals are received at connector **109** from fiber **111** (FIG. **1**).
Receiver **11** includes a coupler/splitter **31**, functioning as a splitter. Splitter **31** splits off a portion of the light, directing part of the optical energy to an energy level or tap detector **33** and passes the remaining light to a second coupler/splitter **32**.

'592 patent at 4:38–44

Detector **33** monitors the light energy in the fiber **111** via the light energy coupled to the detector by splitter **31**. If the

'592 patent at 4:49–50

11

# Dependent Claims Support the Tentative Construction

'327 patent claims 1 and 9:

**1**. A transceiver card for a telecommunications box for transmitting data over a first optical fiber and receiving data over a second optical fiber, the card comprising:

a transmitter for transmitting data over the first optical fiber, the transmitter having a laser, a modulator, and a controller receiving input data and controlling the modulator as a function of the input data, the transmitter transmitting optical signals for telecommunication as a function of the input data;

a fiber output optically connected to the laser for connecting the first optical fiber to the card;

a fiber input for connecting the second optical fiber to the card;

a receiver optically connected to the fiber input for receiving data from the second optical fiber; and

an energy level detector optically connected between the receiver and the fiber input to measure an energy level of the optical signals, wherein the energy level detector includes a plurality of thresholds.

**9**. The card as recited in claim **1** wherein the plurality of thresholds bound an acceptable energy range for the received light.

**"receiver"**
('327 Patent at Claims 1, 14, 25, 36;
'511 Patent at Claims 1, 9
'898 Patent at Claims 1, 14)

# Oyster Agrees With The Court's Tentative Construction

| Oyster | Ciena |
|---|---|
| No construction necessary ('327 and '511 patents)<br><br>"receiver without a modulator" ('898 patent") | "received without a modulator" |

Court's Tentative Construction:

"receiver without a demodulator" ('898 patent)

No construction necessary for the '327 and '511 patents



**The Federal Circuit "has repeatedly held that a district court is not obligated to construe terms with ordinary meanings, lest trial courts be inundated with requests to parse the meaning of every word in the asserted claims."**

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co., Ltd.*,
521 F.3d 1351, 1360 (Fed. Cir. 2008)

- "Receiver" recognized by POSITA as well-known device. Lebby Decl. (Ex. G to Oyster Opening CC Brief) ¶ 37.

- Needs no construction.

- Ciena apparently agree with respect to well-known meaning: Defendants' proposal *simply repeats "receiver"* and tacks on negative limitation

| Ciena |
|---|
| receiver without a demodulator |

The Court has the following questions:

(1) In *Microsoft Corp. v. Multi-Tech Systems, Inc.*, 357 F.3d 1340, 1350 (Fed. Cir. 2004), the court distinguished between using the prosecution history of a later-filed application as relevant evidence for claim construction and finding estoppel based on statements in that history. Assuming that only the "relevance" standard applies, does the patentee's acquiescence that the specification does not enable receivers with demodulators justify limiting the scope of the inventions?

(2) Prosecution disclaimer has two traditional policy justifications: (1) protecting the public's reliance on definitive statements in the prosecution history, and (2) ensuring that claims are not construed one way to obtain allowance and another way against accused infringers. *See Aylus Networks, Inc. v. Apple Inc.*, 856 F.3d 1353, 1359-60 (Fed. Cir. 2017). The second rationale does not apply to disclaimer arising from later-filed applications. Does the first rationale apply in this case?



"Multi–Tech's statements made during the prosecution of the '627 patent with regard to the scope of its inventions as disclosed in the common specification are relevant not only to the '627 and '532 patents, but also to the earlier issued '649 patent."

*Microsoft Corp. v. Multi-Tech Sys., Inc.,* 357 F.3d 1340, 1350 (Fed. Cir. 2004)

> a receiver ~~having a demodulator~~ configured to receive a second optical signal from the second optical fiber and ~~demodulate~~ <u>to convert</u> the second optical signal to ~~produce~~ output data;

Ex. P at 2

- Ciena point to Oct. 21, 2013 amendment to '898 claims as alleged disclaimer

- ***Broadened***, not disclaimed, after amendment:

  - receiver <u>with or without demodulator</u>

  - "demodulate" a <u>species</u> of "to convert"

# Federal Circuit: Removing Limitation Not A Disclaimer



- Amendment to require "non-skin organ cells"

- Rejected on written description grounds

- Patentee withdrew "non-skin" amendment

- Defendant argued "organ" should exclude skin

- ***Court held***:  No disclaimer/exclusion, "organ" given plain and ordinary meaning

*MIT v. Shire Pharms., Inc.,* 839 F.3d 1111 (Fed. Cir. 2016).

- Defendants incorrectly argue that patentee acquiesced in enablement rejection

- No so:

  - ***Broadening*** amendment not acquiescence

  - Patentee argued broadened claims enabled. Ex. P at 8.

- Examiner's enablement rejection incorrect:

  - POSITA understood modulated signals must be demodulated by demodulators known in the art. Lebby Decl. ¶ 37; Lebby Dep. 132:17-22.

- At most, '898 prosecution is "**ambiguous or amenable to multiple reasonable interpretations**" and therefore **not disclaimer**. *Tech. Properties Ltd. LLC v. Huawei Techs. Co.*, 849 F.3d 1349, 1357-58 (Fed. Cir. 2017).

- Ciena incorrectly argue that alleged disclaimer applies to all "receiver" claims

- Prosecution disclaimer "may arise from disavowals made during prosecution of **ancestor** patent applications." *Ormco Corp. v. Align Technology, Inc.*, 498 F.3d 1307, 1314 (Fed. Cir. 2007).

- Amendment here **not** made in an ancestor

  - Amendment on Oct. 21, 2013

  - '327 patent issued Nov. 17, 2009

  - '511 patent issued Feb. 12, 2013

# Acquiesence Does Not Justify Limiting the Scope of the Earlier-Issued Patents

- The amendment in the '898 Patent's prosecution history does not rise to the level of clear and unmistakable disclaimer.

- The amendment in the prosecution history is at most a "statement" by the applicant **by implication**, not a "clear statement" regarding claim scope.

- The amendment broadened the claims, did not disavow any claim scope.

- Notice function: the public should be able to rely on "definitive statements" in the prosecution history. *Aylus Networks, Inc. v. Apple Inc.*, 856 F.3d 1353, 1359-60 (Fed. Cir. 2017).

- But:

  - The broadening amendment regarding the "receiver" term is not a "definitive" statement regarding claim scope suggesting it is "without a demodulator."

- The second rationale from *Aylus* is also relevant.

  - It would be unfair for accused infringers if an applicant could obtain an earlier patent to obtain allowance, and then strategically disclaim scope in subsequent applications to strengthen validity for both later-issued and earlier-issued patents.

**"receiver … configured to convert the second optical signal to output data"**
(''898 Patent at Claims 1, 14)

| Oyster | Ciena |
|---|---|
| "receiver without a modulator" ('898 patent") | "received that converts the second optical signal from optical to electronic form to recover the data carrier by the second optical signal" |

Court's Tentative Construction:

"receiver without a demodulator" ('898 patent)

| Ciena |
|---|
| "received that converts the second optical signal from **optical to electronic form** to <span style="color:darkred">**recover the data carrier by the second optical signal**</span>" |



"We do not import limitations into claims from examples or embodiments appearing only in a patent's written description, even when a specification describes very specific embodiments of the invention or even describes only a single embodiment, unless the specification makes clear that "the patentee ... intends for the claims and the embodiments in the specification to be strictly coextensive." "

*JVW Enterprises, Inc. v. Interact Accessories, Inc.*, 424 F.3d 1324, 1335 (Fed. Cir. 2005)

- Both two instances in the '898 Patent specification that mention conversion of optical signals to electronic form cited by Ciena do not support limiting "receiver":

  - The first is to the '898 Patent's discussion of prior art that does not even use the word "receiver." *See* '898 Patent, at 1:42-45.

  - The second is to a discussion of a "preferred embodiment." *See* '898 Patent, at 3:65, 5:2-5.

- No indication in the specification of intent to limit claims to descriptions of embodiments or the prior art.

- Only one instance in the '898 Patent specification, describing a "preferred embodiment," mentions recovering data. *See* '898 Patent, at 3:65, 5:2-5.

- Again, no indication in the specification that preferred embodiments discussed are intended to be "strictly coextensive"

The Court has the following questions:

(1)     At the time of the '898 Patent invention, could optical signals be converted to something other than electronic form to derive data?

- Photonic computing (no requirement that photons be converted into electronic form)

- Even if optical signals could be converted only to electronic form to derive data at the time, there is no basis to limit "receiver" to the state of the known technology.



"Our case law allows for after-arising technology to be captured within the literal scope of valid claims that are drafted broadly enough."

*Innogenetics, N.V. v. Abbott Labs*., 512 F.3d 1363, 1371–72 (Fed. Cir. 2008)

**"phase modulate" / "phase modulator"**
('327 Patent at Claims 3, 16, 27, 37;
'511 Patent at Claim 9;
'898 Patent at Claims 3, 17)

Court's Tentative Construction: "alter the phase of light without intentionally altering amplitude to create an optical signal having a phase that is representative of data"

34

| Oyster | Ciena |
|---|---|
| "alter the phase of light to create an optical signal having a phase that is representative of data. **Use of phase modulation excludes use of amplitude modulation**." | "alter the phase of light **while keeping the amplitude of the light constant** to create an optical signal that is representative of data" |

Court's Tentative Construction: "alter the phase of light **without intentionally altering amplitude** to create an optical signal having a phase that is representative of data"

Court's Tentative Construction: "alter the phase of light **without intentionally altering amplitude** to create an optical signal having a phase that is representative of data"

How is "intent" measured?

Claims directed to a form of "modulation," i.e. modifying light to represent data.

Variations in amplitude that do not exist to represent data not relevant to whether there is "phase modulation."

The Court has the following questions:

(1)    The parties appear to agree that amplitude modulation is not part of phase modulation. But Oyster argues that Ciena's construction improperly excludes amplitude modulation. Is that not the case for Oyster's construction as well?

(2)    Ciena's construction goes beyond requiring phase modulation to not alter amplitude to require that it actively keep the amplitude constant. Is that the ordinary understanding of phase modulators? Did phase modulators at the time of the invention actively stabilize amplitude? If not, would a construction that phase modulators "alter the phase of light without altering amplitude" (or without "intentionally" altering amplitude) better capture Ciena's meaning?

(3)    Is there a magnitude issue here? In other words, does the amplitude change that occurs during phase modulation fall below some threshold, such that amplitude is still "substantially" constant, compared to amplitude modification?

(4)    What does the "patented secure phase modulated format" in Exhibit M (Oyster's white paper) refer to? Is there another patent that covers the modulation format?

(5)    How common were "continuous phase modulation" and other techniques that phase modulated signals while keeping the amplitude constant at the time of the inventions of the asserted patents?

# Q1. Distinction Between Amplitude Alteration and Modulation

(1)  The parties appear to agree that amplitude modulation is not part of phase modulation. But Oyster argues that Ciena's construction improperly excludes amplitude modulation. Is that not the case for Oyster's construction as well?

Both parties' proposals exclude use of amplitude modulation

Ciena's proposal goes further and improperly excludes any variation or alteration of amplitude

38

# Q1. Distinction Between Amplitude Alteration and Modulation

(1)  The parties appear to agree that amplitude modulation is not part of phase modulation. But Oyster argues that Ciena's construction improperly excludes amplitude modulation. Is that not the case for Oyster's construction as well?

Both parties' proposals exclude use of amplitude modulation

Ciena's proposal goes further and improperly excludes any variation or alteration of amplitude

38

Judge Gilstrap distinguished between amplitude modulation and mere alteration or variation:

As a threshold matter, the parties appear to agree that amplitude modulation is something more than merely altering amplitude. (*See* Dkt. No. 369, Ex. A, Defs.' Technology Tutorial, at 18 ("Amplitude modulation (amplitude-shift keying (ASK)) works by modulating the amplitude of the wave depending on the binary electrical data signal.").)[5] Also, the parties appear to agree that

Defendants have asserted that "in construing 'phase modulate' to mean 'keeping the amplitude . . . constant,' the Court found that the patentee had disavowed claim scope that would cover amplitude variations." (Dkt. No. 262, at 9 (citing Dkt. No. 190, at 16–17).) Yet, what the Court found was "the specification explains that the desired benefits of phase modulation are obtained only in the absence of amplitude *modulation*," not merely "variations" as Defendants have asserted. (Dkt. No. 190, at 17 (emphasis modified).) In the final paragraph of its analysis,

Ex. C at 7–8

39

> (2)  Ciena's construction goes beyond requiring phase modulation to not alter amplitude to require that it actively keep the amplitude constant. Is that the ordinary understanding of phase modulators? Did phase modulators at the time of the invention actively stabilize amplitude? If not, would a construction that phase modulators "alter the phase of light without altering amplitude" (or without "intentionally" altering amplitude) better capture Ciena's meaning?

No evidence in the record of any phase modulator that has ever actively stabilized amplitude

Claims say what modulation is used; no support in the claims for going beyond limiting the form of modulation; no disclaimer or lexicography concerning "altering" or "variation" that is not modulation

40

# Q3. What Is Necessary to Achieve Benefit?

(3)     Is there a magnitude issue here?  In other words, does the amplitude change that occurs during phase modulation fall below some threshold, such that amplitude is still "substantially" constant, compared to amplitude modification?



Figure 3

function. Depending upon the electrical bandwidth of photo-detector **153** and the optical signal format present at the input to photodetector **153**, the electrical signal may be filtered by a low pass filter **154** to provide an average voltage level which represents the average optical power measured by photode-tector **153**. After filtering the signal, the electrical signal may

'327 patent at Fig. 3, 5:32–37

41

(4)    What does the "patented secure phase modulated format" in Exhibit M (Oyster's white paper) refer to?  Is there another patent that covers the modulation format?

## White paper refers to technology "patented" in 2003:

*Copyright © 2002-2003 Oyster Optics, Inc.*

Ex. M

(12) **United States Patent**
Snawerdt

(10) Patent No.:     US 7,620,327 B2
(45) Date of Patent:     *Nov. 17, 2009

(12) **United States Patent**
Snawerdt

(10) Patent No.:     US 6,469,816 B1
(45) Date of Patent:     *Oct. 22, 2002



*Figure 4: Example of Oyster Optics' Patented Secure Transmission Architecture*

Ex. M at 15



'816 Patent, Figure 1

By sending the data in phase-modulated form, as opposed to amplitude modulated form, the data is must be read by an interferometer receiver. The use of such a receiver is easy to

'816 Patent, at 3:19–22

(5)  How common were "continuous phase modulation" and other techniques that phase modulated signals while keeping the amplitude constant at the time of the inventions of the asserted patents?

No evidence of use of "continuous phase modulation" at the time in the record

Contemporaneous evidence from inventor's other patents suggest "continuous phase modulation" not used

44

FIG. **2** shows the card **1** of the present invention in more detail. A transmitter **10** transmits signals over optical fiber **110** (FIG. **1**). Transmitter **10** includes a single laser **12**, for example a semiconductor laser emitting a narrow band of light at approximately 1550 nm, or at other wavelengths. Light emitted from laser **12** passes through a phase modulator **16**, for example a Mach-Zender phase modulator.

'592 patent at 4:11–17

Q  Is there any way to avoid having a dip in the amplitude during the transition from one phase to another when using a Mach-Zehnder modulator to phase modulate a signal?
A  It is unavoidable.

that could occur. In fact, Bill Thompson mentions that in his deposition too. But fundamentally that's the way Mach-Zehnders work is you will have that transitory drop in signal between -- at least between adjacent 0 and 1 bits.

Ex. C at 12

**"a transmitter having a laser, a modulator, and a controller" ('327 Patent at Claims 1, 14, 25, 26; '898 Patent at Claims 1, 14)**

# "a transmitter having a laser, a modulator, and a controller"

| Oyster | Ciena |
|---|---|
| No construction necessary:<br>"a transmitter *having* a laser, a modulator, and controller" | "a transmitter having a laser, modulator, and a controller located within the transmitter" |

Court's Tentative Construction: "a transmitter *containing* a laser, modulator, and a controller"



The "claim construction inquiry ... begins and ends in all cases with the actual words of the claim."

*Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1324 (Fed. Cir. 20)

# "Clear and Unmistakable" Language Required To Limit Terms



**"There are only two exceptions to this general rule" that terms are "given their ordinary and customary meaning":**

**(1) the patent "<u>clearly set forth </u>a definition of the disputed claim term," or**

**(2) there is a "<u>clear and unmistakable disclaimer.</u>"**

*Thorner v. Sony Computer Enter. Am. LLC*, 669 F.3d 1362, 1365-1367 (Fed. Cir. 2012).

The Court has the following questions:

(3)     Is there a substantive difference between a transmitter "holding, including, or containing" the laser, modulator, and controller, and those elements being located within the transmitter?

# Plain Meaning of "Having" Is Broader Than "Within"

A pertinent dictionary definition of "having" is "to hold, include, or contain as a part or whole <the car *has* power brakes> <April *has* 30 days>." *Webster's Tenth Collegiate Dictionary* 533 (1998) (Ex. 3001) (emphases in original). Therefore, with this definition, a transmitter having a laser would hold, include, or contain the laser. The Specification of the '898 patent supports that construction. Transmitter 10 in the Specification "includes a single laser 12 . . . ." Ex. 1201, 4:32–34, Fig. 2. Further, in the Background

Ex. T, Institution Decision, CaseIPR2018-00070, at 17 (emphasis added).

51

- Definition makes clear that only some, but not all, of the term's plain meaning is to "contain" or "hold'

  - "Containing" or "holding" even in part is sufficient

- Patents use the narrower term "comprising" when describing elements "contained"

An object of the present invention is to provide a trans-
25 ceiver card for providing secure optical data transmission
over optical fiber. Another alternate or additional object of the
present invention is to provide for replacement of existing
cards with a transceiver card permitting ODTR and tapping
detection capabilites.

'898 Patent at 2:26-29

35 size and certain component types from OC-192 cards.
While the cards may be placed in new boxes, the present
invention also permits for the removal of existing optical
transmission cards to be easily replaced by the enhanced
security cards. The fibers are disconnected, the box **2** is sim-
40 ply opened and the amplitude-modulated-based card is
removed. The card **1** is inserted into the bus **6** and the fibers
are connected.

'898 Patent at 6:36-42



Pet., 20 (annotating Ade's Fig. 1). Petitioners even label this input light as "'laser' input," *id*., recognizing that laser is external to the transceiver 8. This is consistent

Ex. AA, Patent Owner's Preliminary Response, at 25.

discussion of Ade, Ade clearly discloses that the light source is ***external to the***

***transmitter***. In particular, Petitioners admit that a "laser ***inputs*** light to Ade's

'modulator 10,'" and therefore present a differently-highlighted version of Ade's

Fig. 1, showing optical receiver/transmitter (transceiver) 8 with CW INPUT

LIGHT 16 input to transceiver 8 (Pet., 20) (emphasis added):

Pet., 20 (annotating Ade's Fig. 1). Petitioners even label this input light as "'laser'

input," *id*., recognizing that laser is external to the transceiver 8. This is consistent

Ex. V, Case IPR 2017-01870m Patent Owner Preliminary Response at 21



**Where "statements in the prosecution history are subject to multiple reasonable interpretations, they do no constitute clear and unmistakable disclaimer"**

*Golight, Inc. v. Wal-Mart Stores, Inc.*, 355 F.3d 1327, 1332 (Fed. Cir. 2004).

## CERTIFICATE OF SERVICE

I hereby certify that the counsel of record who are deemed to have consented to electronic service are being served on July 22, 2020 with a copy of this document via the Court's ECF system.

DATED: July 22, 2020

Respectfully submitted,

By: /s/ *Reza Mirzaie*

Reza Mirzaie

RUSS AUGUST & KABAT