BLAIR M. JACOBS (admitted *pro hac vice*)
blairjacobs@paulhastings.com
CHRISTINA A. ONDRICK (admitted *pro hac vice*)
christinaondrick@paulhastings.com
JOHN S. HOLLEY (admitted *pro hac vice*)
johnholley@paulhastings.com
PAUL HASTINGS LLP
2050 M Street NW
Washington, DC 20036
Telephone:  (202) 551-1700
Facsimile:  (202) 551-1705

THOMAS A. COUNTS (S.B. # 148051)
tomcounts@paulhastings.com
PAUL HASTINGS LLP
101 California Street, 48th Floor
San Francisco, CA 94111
Telephone:  (415) 856-7000
Facsimile: (415) 856-7116

RAYMOND W. STOCKSTILL (S.B. # 275228)
beaustockstill@paulhastings.com
PAUL HASTINGS LLP
695 Town Center Drive, 17th Floor
Costa Mesa, CA  92626
Telephone:  (714) 668-6200
Facsimile:  (714) 979-1921

Attorneys for Defendant
CIENA CORPORATION

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| OYSTER OPTICS, LLC,<br><br>Plaintiff,<br><br>vs.<br><br>CIENA CORPORATION,<br><br>Defendant. | CASE NO. 4:17-cv-05920-JSW<br><br>**DEFENDANT CIENA CORPORATION'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT**<br><br>Hearing:      July 16, 2021 at 9:00 AM<br>Judge:        Hon. Jeffrey S. White |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**NOTICE OF MOTION**

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE THAT on July 16, 2021, or soon thereafter as they may be heard, in the courtroom of the Honorable Jeffrey S. White, Oakland Courthouse, Courtroom 5, 2nd Floor, 1301 Clay Street, Oakland, CA 94612, Defendant Ciena Corporation ("Ciena") hereby moves pursuant to Federal Rule of Civil Procedure 56 for an order granting summary judgment.

Good cause exists for granting the relief requested. Ciena's motion is based on and supported by the memorandum of points and authorities contained herein, and the Declaration of Blair M. Jacobs submitted concurrently herewith, all other pleadings and papers on file in this action, and all other evidence, information, and argument that will be presented to the Court in connection with this motion.

**STATEMENT OF RELIEF REQUESTED**

Defendants respectfully request that the Court grant Defendants' motions for summary judgment of non-infringement of U.S. Patent Nos. 7,620,327 and 8,913,898, no indirect infringement, invalidly for lack of enablement, exhaustion of Oyster's rights, and license of Ciena's products that include a licensed Fujitsu modulator.

DATED: MAY 21, 2021

By: /s/ Blair M. Jacobs
    Blair M. Jacobs
    blairjacobs@paulhastings.com
    Christina A. Ondrick
    christinaondrick@paulhastings.com
    John S. Holley
    johnholley@paulhastings.com
    PAUL HASTINGS LLP
    2050 M Street NW
    Washington, DC 20036
    Telephone:  (202) 551-1700
    Facsimile:  (202) 551-1705

    Thomas A. Counts (CA BN 148051)
    tomcounts@paulhastings.com
    PAUL HASTINGS LLP
    101 California Street, 48th Floor

1

2

San Francisco, CA 94111
Telephone:  (415) 856-7000
Facsimile: (415) 856-7116

3

4

RAYMOND W. STOCKSTILL (S.B. # 275228)
beaustockstill@paulhastings.com
PAUL HASTINGS LLP

5

6

695 Town Center Drive, 17th Floor
Costa Mesa, CA  92626
Telephone:  (714) 668-6200
Facsimile:  (714) 979-1921

7

8

*Attorneys for Defendant*
CIENA CORPORATION

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

BLAIR M. JACOBS (admitted *pro hac vice*)
blairjacobs@paulhastings.com
CHRISTINA A. ONDRICK (admitted *pro hac vice*)
christinaondrick@paulhastings.com
JOHN S. HOLLEY (admitted *pro hac vice*)
johnholley@paulhastings.com
PAUL HASTINGS LLP
2050 M Street NW
Washington, DC 20036
Telephone:  (202) 551-1700
Facsimile:  (202) 551-1705

THOMAS A. COUNTS (S.B. # 148051)
tomcounts@paulhastings.com
PAUL HASTINGS LLP
101 California Street, 48th Floor
San Francisco, CA 94111
Telephone:  (415) 856-7000
Facsimile: (415) 856-7116

RAYMOND W. STOCKSTILL (S.B. # 275228)
beaustockstill@paulhastings.com
PAUL HASTINGS LLP
695 Town Center Drive, 17th Floor
Costa Mesa, CA  92626
Telephone:  (714) 668-6200
Facsimile:  (714) 979-1921

Attorneys for Defendant
CIENA CORPORATION

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| OYSTER OPTICS, LLC,<br><br>Plaintiff,<br><br>vs.<br><br>CIENA CORPORATION,<br><br>Defendant. | CASE NO. 4:17-cv-05920-JSW<br><br>**DEFENDANT CIENA CORPORATION'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT**<br><br>Hearing:     July 16, 2021 at 9:00 AM<br>Judge:      Hon. Jeffrey S. White<br><br>**[REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED]** |

Ciena's Notice of Motion and
Motion for Summary Judgement

1

**SUMMARY OF ARGUMENT**

2      The expired Asserted Patents relate to a narrow and specific application of optical tap

3 detection—within a direct detect telecommunications system—that Oyster now seeks to broadly

4 apply to Ciena's pioneering coherent WaveLogic 2 and WaveLogic 3 (collectively "WaveLogic")

5 telecommunication cards, despite the fact that Ciena's products have nothing to do with optical

6 tap detection.  Oyster's dated patents cannot begin to capture the significant advances provided by

7 Ciena's independently developed and revolutionary products, and summary judgment of no

8 infringement is thus warranted.

9      Specifically, the Court's claim construction of "a transmitter having a laser, a modulator,

10 and a controller" foreclosed Oyster's infringement theory, and the case should have been dropped

11 by Oyster long ago.  Ciena's accused WaveLogic coherent cards are highly complex and utilize

12 technology in a way acknowledged by Oyster to be *impossible* at the time the asserted patents.

13 While the patents require physically containing a laser and a controller within the transmitter, no

14 Accused Product has a transmitter physically containing either a laser or a controller.  Thus

15 summary judgment is warranted for all claims on two separate but similar grounds.  Likewise

16 the '898 patents "receiver" is a "receiver without a demodulator," Ciena cannot infringe as even

17 Oyster's technical expert concedes that Ciena's receivers contain a demodulator.  Also, the '327

18 patent claims require an "energy level detector," but Ciena's products measure power, not energy.

19      Summary judgment is separately warranted based on the invalidity of both patents.  The

20 Court has acknowledged Oyster's efforts to disclaim any receiver with a demodulator.  Oyster

21 now cannot show, as a matter of law, that the patents' common specification, which Oyster's

22 expert concedes is "mute" about the design of the claimed receiver, enables a receiver with or

23 without a demodulator.  Oyster's expert even concedes that a receiver "without a demodulator" is

24 impossible, yet that is precisely what is required here based on Oyster's prosecuting history.

25      Finally, under prior adjudications binding on Oyster, Oyster exhausted and released its

26 claims against products of Fujitsu's customers—like Ciena—that contain Fujitsu modulators.  As

27 a result, partial summary judgment is appropriate for any product with a Fujitsu modulator.

28

1

2

**Table of Contents**

3    I.      INTRODUCTION AND OVERVIEW OF BRIEF ................................................ 1

4    II.     LEGAL STANDARD ........................................................................................... 1

     III.    CIENA'S MOTION FOR SUMMARY JUDGMENT ......................................... 1
5
             A.      Summary Judgment of Non-Infringement Should be Granted ................ 1
6
                     1.      No Ciena Product Includes a Receiver Without A Demodulator ............... 3
7
                     2.      No Ciena Product Contains a Transmitter Having a Laser ........................ 6
8
                     3.      No Ciena Product Contains a Transmitter Having a Controller ................ 9
9
                     4.      No Ciena Product Contains an Energy Level Detector............................ 12
10
             B.      The Full Scope of the Claimed Receiver is Not Enabled........................ 14
11
             C.      Summary Judgment of No Indirect Infringement Is Warranted ............ 17
12
             D.      Substantial Damages are Released and/or Exhausted Based on the Prior Oyster-
13                   Fujitsu Agreement ................................................................................. 19

14                   1.      Prior Litigation and Rulings........................................................ 19

                     2.      Material Facts .............................................................................. 21
15
                     3.      Legal Standards ........................................................................... 23
16
                     4.      Oyster's Claims Against Ciena's Products Incorporating Fujitsu
17                           Modulators Are Exhausted.......................................................... 23

18

19

20

21

22

23

24

25

26

27

28

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Cases**

4

*Bayer AG v. Elan Pharm. Research Corp.*,
   212 F.3d 1241 (Fed. Cir. 2000)....................................................................................1

5

6

*Carborundum Co. v. Molten Metal Equip. Innovations, Inc.*,
   72 F.3d 872 (Fed. Cir. 1995)......................................................................................23

7

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986)......................................................................................................1

8

9

*Commil USA, LLC v. Cisco Sys., Inc.*,
   U.S., 135 S.Ct. 1920 (2015)........................................................................................17

10

*Dedier v. Grossman*,
   454 S.W.2d 231 (Tex. App. 1970)..............................................................................25

11

12

*Diruzza v. Cty. of Tehama*,
   323 F.3d 1147 (9th Cir. 2003).....................................................................................25

13

14

*Ecolab, Inc. v. FMC Corp.*,
   569 F.3d 1335 *amended on reh'g in part*, 366 Fed. Appx. 154 (Fed. Cir. 2009)....................19

15

16

*Evans Cooling Sys., Inc. v. Gen. Motors Corp.*,
   125 F.3d 1448 (Fed. Cir. 1997)...................................................................................21

17

*Exergen Corp. v. Wal-Mart Stores, Inc.*,
   575 F.3d 1312 (Fed. Cir. 2009)...............................................................................4, 15

18

19

*Global–Tech Appliances, Inc. v. SEB S.A.*,
   563 U.S. 754 (2011)...............................................................................................17, 18

20

21

*IPVenture, Inc. v. ASUS Computer Int'l*,
   No. 12-cv-04143-JSW, Dkt. 159, 4-6 (N.D. Cal. Jan. 30, 2013)...............................18

22

*Liquid Dynamics Corp. v. Vaughan Co.*,
   449 F.3d 1209 (Fed. Cir. 2006)...................................................................................15

23

24

*MagSil Corp. v. Hitachi Global Storage Technologies, Inc.*,
   687 F.3d 1377 (Fed. Cir. 2012)...................................................................................15

25

26

*Markman v. Westview Instruments, Inc.*,
   517 U.S. 370 (1996)....................................................................................................15

27

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
   475 U.S. 574 (1986)......................................................................................................1

28

- iii -
DEFENDANT CIENA'S MOTION FOR
SUMMARY JUDGMENT

*McRO, Inc. v. Bandai Namco Games Am., Inc.*,
959 F.3d 1091 (Fed. Cir. 2020)........................................................................................15

*Nat'l Recovery Techs., Inc. v. Magnetic Separation Sys., Inc.*,
166 F.3d 1190 (Fed. Cir. 1999)........................................................................................15

*Nat'l Union Fire Ins. Co. v. CBI Indus.*,
907 S.W.2d 517 (Tex. 1995)............................................................................................25

*Oyster Optics, LLC v. Alcatel-Lucent USA, Inc.*,
816 F. App'x 438 (Fed. Cir. 2020) ......................................................................21, 22, 24

*Oyster Optics, LLC v. Coriant America Inc. et al*,
No. 2:16-cv-1302 (E.D. Tex.) ...................................................................................*passim*

*Oyster Optics, LLC v. Fujitsu Network Communications Inc., et al.*,
No. 2:18-cv-153 (E.D. Tex. April 17, 2018).....................................................................20

*Oyster Optics, LLC, v. Infinera Corp. et al.*,
Case No. 2:19-CV-257, slip op. .........................................................................................20

*PersonalWeb Techs. LLC v. Int'l Bus. Machines Corp.*,
2017 WL 2180980 (N.D. Cal. May 18, 2017) ...................................................................14

*Proxyconn v. Microsoft*,
2012 WL 1835680 (C. D. Cal. May 16, 2012) ..................................................................18

*Quanta Compuer, Inc. v. LG Elecs., Inc.*,
553 U.S. 617 (2008).........................................................................................................23

*Stine v. Stewart*,
80 S.W.3d 586 (Tex. 2002) (per curiam) ........................................................................25

*Town of N. Bonneville v. Callaway*,
10 F.3d 1505 (9th Cir. 1993)......................................................................................23, 25

*Trustees of Boston University v. Everlight Electronics Co. Ltd.*,
896 F.3d 1357 (Fed. Cir. 2018)........................................................................................15

*United States v. Univis Lens Co.*,
316 U.S. 241 (1942).........................................................................................................23

*Unwired Planet, LLC v. Apple Inc.*,
106 F. Supp. 3d 1083 (N.D. Cal. 2015) ...........................................................................19

*In re Westgate-California Corp.*,
642 F.2d 1174 (9th Cir. 1981)..........................................................................................25

*Zamora Radio, LLC v. Last.F.M., Ltd.*,
2010 WL 5140678 (S. D. Fla. 2010).................................................................................18

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## I.      INTRODUCTION AND OVERVIEW OF BRIEF

Ciena Corporation ("Ciena") first addresses its motions for summary judgment of non-infringement of the asserted claims of U.S. Patent Nos. 7,620,327 ("the '327 Patent") and 8,913,898 ("the '898 Patent") (collectively "the Asserted Patents").  Next, Ciena addresses its motion for summary judgment that the asserted claims lack enablement.  Next, Ciena addresses its motion for summary judgment of no indirect infringement.  Finally, Ciena addresses the issues relating to the Fujitsu Settlement and asks the Court to declare Ciena's products that include Fujitsu Modulator Licensed Products are released and exhausted, consistent with the holdings of the Federal Circuit and the District Court of the Eastern District of Texas.

## II.     LEGAL STANDARD

Summary judgment is proper when the movant demonstrates that no genuine issues of material fact exist and that the moving party is entitled to judgment as a matter of law. *See, e.g.*, Fed. R. Civ. P. 56.  A movant may prevail on summary judgment by pointing out the "absence of evidence to support the nonmoving party's case" concerning an issue on which the non-movant bears the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  To defeat summary judgment, the nonmoving party must do "more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Rather, the nonmoving party must set forth "specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e); *Matsushita Elec.*, 475 U.S. at 587.

Oyster presented no doctrine of equivalents evidence; thus, Oyster bears the burden of proving infringement literally.  *See, e.g., Bayer AG v. Elan Pharm. Research Corp.*, 212 F.3d 1241, 1247 (Fed. Cir. 2000).  Literal infringement requires the patentee to prove the accused device contains *each and every limitation* of the asserted claim.  *See Bayer AG*, 212 F.3d at 1247.

## III.    CIENA'S MOTION FOR SUMMARY JUDGMENT

### A.      Summary Judgment of Non-Infringement Should be Granted

This case presents a textbook example of a non-practicing entity overreaching by misapplying purchased patents to technology that has evolved well beyond the scope of the claimed inventions.  Oyster overreaches through strained, overbroad, and continually morphing

1  and implausible applications of the claim language.  Oyster also re-interprets and

2  mischaracterizes the Court's claim constructions in a manner that contradicts the constructions.

3  The Asserted Patents relate to a narrow application of optical tap detection—within a direct detect

4  system—that Oyster now seeks to apply to Ciena's pioneering coherent WaveLogic 2 and

5  WaveLogic 3 (collectively "WaveLogic") telecommunication cards, despite the fact that Ciena's

6  products have nothing to do with optical tap detection.  Oyster's dated patents have nothing to do

7  with the significant advances provided by Ciena's independently developed and revolutionary

8  products, and summary judgment of no infringement is thus warranted.  Specifically, as discussed

9  below, the Court's claim construction of "a transmitter having a laser, a modulator, and a

10  controller" foreclosed Oyster's infringement theory, and the case should have been dropped by

11  Oyster long ago.[1]

12      Ciena's accused WaveLogic cards are highly complex and utilize technology in a way

13  acknowledged by Oyster to be *impossible* at the time the asserted patents were filed in the early

14  2000s.  For example, the receiver in Ciena's WaveLogic cards demodulates the received optical

15  signals while the Court has construed the receiver element of the asserted '898 patent as a

16  receiver *without* a demodulator.  Summary judgment is warranted for the '898 patent for this

17  reason.

18      Similarly, Ciena's WaveLogic cards use a single laser whose light is split and shared

19  between the transmitter and receiver–a coherent system.  In contrast, the laser disclosed in the

20  Asserted Patents is used solely by and physically contained within the transmitter.  In light of the

21  Court's construction of "having," no Ciena accused product includes a transmitter having a laser,

22  and this warrants entry of summary judgment as to all claims.

23      The WaveLogic cards also utilize a revolutionary digital signal processor ("DSP") that

24  allowed Ciena to commercialize the world's first coherent optical system.  However, in light of

25  the Court's construction of "having" and the fact that the DSP in Ciena's accused products is not

26  part of the transmitter, Oyster's expert was forced to take the dubious position that a driver, which

---

[1] Oyster's technical expert, Dr. Goossen, testified at his deposition that he was *not aware* that the transmitter must "physically encompass a laser, modulator and controller," perhaps explaining some of Oyster's strained infringement reads.  (Ex. 7 at 129:20-130:7.)

1  merely amplifies a signal, satisfies the "controller" element.  Oyster did this because, in the very

2  limited subset of WaveLogic products analyzed by Oyster's expert, the driver, unlike the DSP, is

3  physically located ████████████ that Oyster asserts physically contains *all* of the transmitter

4  components.  The undisputed evidence shows that neither the driver nor the DSP satisfies the

5  controller element, so summary judgment is equally warranted for this reason.

6       The asserted claims, consistent with their tap-detection purpose, have specific elements

7  tied to detecting a tap on a fiber optic line that, not surprisingly, do not exist in Ciena's

8  WaveLogic cards.  Indeed, several asserted claims recite an "energy level detector" to determine

9  whether energy is being removed from the fiber while none of Ciena's accused products detect

10  energy for this purpose.  As confirmed by the Court's construction of this term, a key requirement

11  of the asserted claims is detecting an "energy level," not power, as proposed by Oyster during

12  claim construction proceedings.  Oyster's expert attempted to prove infringement by equating

13  energy with power in his report but was forced during his deposition to concede that energy is

14  different from power.  Dr. Goossen's admission is dispositive of all but two asserted claims.

15  **1.   No Ciena Product Includes a Receiver Without A Demodulator**

16       This issue is dispositive of every asserted claim of the '898 patent.  The Court construed

17  the '898 patent's claimed "receiver" as "receiver ***without*** a demodulator."  (Dkt. No. 127 at

18  16:23-24.)  Dr. Goossen's infringement analysis regarding the receiver element mischaracterizes

19  the Court's construction, arguing that the Court meant to construe the "receiver" term as any

20  receiver that does not *fully demodulate* a signal.  (Ex. 1 at ¶¶60, 61, 247; *see also* Ex. 4 at ¶¶76,

21  78, 79 ("a POSITA simply would not interpret the claims" to require a receiver without a

22  demodulator); Ex. 7 at ¶ 367:14-368:2.)  Summary judgment is appropriate because Dr.

23  Goossen's infringement position actually concedes non-infringement.

24       There is no dispute that the receiver in Ciena's accused products demodulates the received

25  optical signal.  (Ex. 7 at 367:14-368:2; 370:24-371:16 (Dr. Goossen agreeing that "Ciena's

26  products have at least some form of demodulation occurring in the receiver"); Ex. 1 at ¶74 (the

27  receiver extracts, i.e., demodulates, the encoded data); Ex. 2 at ¶¶484-498; Ex. 12 at 18:20-23 (the

28  "LO is mixed with the input signal through what are called 90-degree hybrid functions" that

1  "demodulates information into [] what's called the I and Q planes"); 91:16-23 (the local oscillator

2  is "for mixing to demodulate"); 136:6-19 (the ICR is a "demodulator"); 182:10-17 (mixing in

3  Ciena's ICR is "demodulation").)

4       Faced with this undisputed evidence and the Court's construction that excludes

5  demodulation in the receiver, Dr. Goossen contends that Ciena's "receiver" **starts** the

6  "demodulation function" that is then completed outside of the "receiver" in Ciena's ███ DSP.

7  (Ex. 4 at ¶78.)  Dr. Goossen's opinion contradicts the Court's construction because the

8  construction excludes *any* demodulation in the receiver, i.e., a receiver *without* a demodulator.  Of

9  course, "[n]o party may contradict the court's construction to a jury" so Dr. Goossen's attempt to

10  force a material issue of factual dispute on the scope of the claimed receiver is futile.  *Exergen*

11  *Corp. v. Wal-Mart Stores, Inc*., 575 F.3d 1312, 1321 (Fed. Cir. 2009).

12       Moreover, Dr. Goosen's opinion is belied by the objective evidence from the OIF.  The

13  below OIF figure, relied upon by Dr. Goossen throughout his report and the basis for Oyster's

14  infringement contentions, indisputably shows that coherent receivers, like Ciena's must include

15  demodulators (shown as "demods").

16

17

18

19

20

21  Figure 2-3: Type-1 Control & Monitoring Functional Diagram

22  (Ex. 17 at 00068 (annotated); *see also* Ex. 1 at ¶61; Ex. 7. at 376:23-377:5 (conceding that the

23  ICR in the figure above includes a receiver with a demodulator.)  No reasonable jury could

24  conclude that Ciena's accused products include a receiver *without* a demodulator, and summary

25  judgment is thus warranted for this reason as well.

26       Finally, Dr. Goossen's demodulator opinion regarding the receiver is inconsistent with the

27  opinions he offers regarding the modulator in the transmitter.  (*Compare* Ex. 1 at ¶¶33-35 (at the

28  *transmit* side, the client data is partially modulated in the DSP, which outputs electrical signals

that are modulated onto the lightwave), 161-62 (the "modulator" encodes the electrical signals onto a lightwave and outputs a modulated lightwave) *with id.* at ¶¶249-51 (at the *receive* side, the receiver decodes the modulated lightwave into electrical signals containing the client data), *id.* at ¶247.)  Put simply, Dr. Goossen contends that the partial modulation at the DSP on the transmit side is *not* part of the claimed "modulator" (thus allowing the transmitter to physically contain the modulator) but that the partial demodulation at the DSP on the receive side *is* the "demodulator."  (*Compare id.* at ¶162 (the electrical to optical converter QPMZ is the modulator) *with id.* at ¶249 (the optical to electrical converter ICR is *not* the demodulator), *id,* at ¶247 (the DSP is the "demodulator").)  Dr. Goossen cannot have it both ways—modulation and demodulation are parallel processes.  The evidence plainly shows that "modulation is encoding data on a signal by changing properties of a carrier wave." (Ex. 1 at ¶191.)  Conversely, demodulation is the extraction of data from its carrier.  (Ex. 2 at ¶487; *see also* Ex. 1 at ¶74.)  There is no dispute that Ciena's ICR "convert[s] the [optical] signal" to electronic form by extracting data from the lightwave carrier. (Ex. 7. at 374:18-377:5; Ex. 1 at ¶74; Ex. 2 at ¶¶492, 500.)

In attempting to salvage infringement of the '898 patent, Oyster faces a Morton's fork, having to choose between (1) only the receiver's DSP being a "demodulator," thus conceding non-infringement for both asserted patents because of the implications that this position has on the modulator, or (2) acknowledging that receiver includes a demodulator and conceding non-infringement of the '898 patent.  Oyster's first choice concedes non-infringement because it would mean that the DSP on the transmit side is the "modulator," but the DSP is not physically contained in the transmitter as required by this Court's claim construction.  Oyster's second choice concedes non-infringement because it would be an admission that the receiver is demodulating the lightwave when the data is extracted from it.  The inconsistencies created by Dr. Goossen's strained demodulator theory further confirm that no reasonable jury could conclude that Ciena's accused products include a receiver without a demodulator, and summary judgment is thus warranted.

1

2. **No Ciena Product Contains a Transmitter Having a Laser**

2        This issue is dispositive for every Asserted Claim.  A key part of this Court's claim

3 construction ruling clarified, over Oyster's opposition, that the asserted claims require a

4 transmitter physically encompassing a laser.  Ciena's accused WaveLogic products do not include

5 a "transmitter *having* a laser," which was construed as a "transmitter *containing* a laser" where

6 "containing" means "physically encompassing."  Dkt. No. 127 at 22:7-8, 22-26.  There is no

7 material factual dispute regarding this point; instead, Oyster's expert Dr. Goossen wrongly

8 contends the infringement exists because of imaginary, not physical, containment.

9        In virtually all fiber optic communication systems, the transmitter uses laser light to carry

10 modulated data.  In Ciena's revolutionary coherent detection system, the *receiver also* uses laser

11 light.  The receiver mixes the laser light (a local oscillator) with the received optical signal as part

12 of its demodulation technique.  (Ex. 2 at ¶¶67, 154, 155, fn5, 157, 173-175, 181, 484; Ex. 3 at

13 ¶235; Ex. 1 ¶¶41, 59; Ex. 15 at 221:12-23 (A "coherent lightwave receiver" includes "a local

14 oscillator," "[o]therwise, it wouldn't be a coherent receiver").)

15        Given that both coherent transmitters and receivers require laser light to operate, Ciena

16 developed technology in which a *single* laser provides light that is used for *both* the transmitter

17 and the receiver.  To make this work, part of the laser's light is provided to the receiver and the

18 remainder is provided to the transmitter.  (Ex. 12 at 29:22-25; 139:24-140.)  Oyster's expert, Dr.

19 Goossen, concedes that in Ciena's WaveLogic cards, the laser's light is split between the

20 transmitter and receiver.  (Ex. 7 at 221:19-222:6; 228:15-20.)

21



22

23 (Ex. 16 at 3092 (cropped).)

24        Dr. Goossen cites the above-mentioned Ciena-engineering document (Ex. 16) relating to

25 the WaveLogic 3 to argue Oyster's infringement position that the transmitter "physically

26 encompasses" the laser.  (Ex. 1 at ¶¶159-161.)

27

28

(Ex. 16 at 2878 (cropped); *see also* Ex. 1 at ¶¶159-161 (citing this figure).)  This document shows that the accused WaveLogic 3 transceiver uses light from an external source (labeled "Laser (ITLA)" whose light (depicted by red lines in the figure) is shared with the integrated coherent receiver (ICR).  The fact that the light must be "split" and separately provided to both the transmitter and receiver in Ciena's products confirms that the WaveLogic cards' laser is not physically encompassed by *either* the transmitter or the receiver.  Indeed, Dr. Goossen conceded during deposition that if the light is being split to go to the receiver, then the laser cannot be part of the receiver.  (Ex. 7 at 234:12-18.)  Dr. Goossen's concession in this regard is a tacit concession of non-infringement—"if the light is being split to go to the [transmitter], then the laser cannot be part of the [transmitter]."  (*Id.*)

Oyster's infringement theory ignores this reality through little more than an arbitrary line-drawing exercise.  Dr. Goossen asserts that "the laser" is "contained in the transmitter" solely because the laser is mounted ████████████████████████████.  (Ex. 1 at ¶161.)  According to Dr. Goossen, the laser cannot be contained by the receiver, despite using half the laser light, because the receiver is ████████████████████████████████ ██████████[2] (*Id.*)

Not only is Dr. Goossen's impermissible line drawing exercise contrary to the undisputed operational principles of Ciena's WaveLogic cards, but it also contradicts Oyster's infringement contentions in the case.  (*See generally* Exs. 18, 19.)  Oyster's infringement contentions relied

---

[2] Emphasis added because Oyster's assertion directly conflicts with Oyster's position regarding the "transmitter having . . . a controller," discussed below.  For that assertion, Dr. Goossen opined that because the ██████████████████████████ no distinctions could be drawn for components ██████████████ Ex. 7 at 195:7-15.

1  exclusively upon a belief that Ciena practiced an Optical Internetworking Forum ("OIF")

2  generally agreed upon architecture, as shown in Exs. 17, 20.  (*See also* Ex. 7 at 113:1-5 (testifying

3  that the accused Ciena products "conform" to the OIF standard).)  As can be seen below from an

4  OIF figure (Ex. 17) relied upon by Oyster's expert, and an OIF figure (Ex. 20) relied upon for the

5  "transmitter" claim element in Oyster's infringement contentions (Exs. 18, 19), the laser in the

6  OIF standards, like Ciena's accused products, is ***external*** to, not contained in, the transmitter.

| Ex. 17 at 0068 (*see also id.* at 0065)— Cited By Dr. Goossen. | Ex. 18 at 7 (citing Ex. 20 at 9); Ex. 19 at 6 (citing Ex. 20 at 9)—Oyster's Infringement Contentions |
| --- | --- |



(Ex. 17 at 068 (showing the laser is contained by neither the transmitter nor the receiver)

compared with Ex. 18 (Oyster's '327 patent contentions) at 7 (showing the laser is contained by

neither the transmitter nor the receiver); *see also* Ex. 19 (Oyster's '898 patent contentions at 6

(showing the same).)

Oyster cannot have it both ways.  On the one hand, Oyster relied solely upon the OIF

standards in its infringement contentions throughout this case, while on the other hand, the OIF

standards indisputably show that the transmitter ***does not physically contain a laser***, as expressly

required by the asserted claims of the Asserted Patents.

Oyster attempts to sidestep the evidence and the Court's construction by having its expert

assert that he could "draw an imaginary box around [the claimed components of the transmitter]

and they're contained."  (Ex. 7 at 140:15-23.)  Putting aside whether this hocus pocus theory was

previously disclosed and/or inconsistent with that Court's construction that the transmitter must

contain the laser, there is no genuine issue of fact that the laser in Ciena's accused products is not

segregated into one part contained by the transmitter and one part contained by the receiver.

Oyster's strategic "box-drawing" exercise allows for Oyster to draw the transmitter assembly

1    anywhere it desires on the transceiver card, thereby eviscerating any distinction between the

2    transceiver and transmitter and contravening both this Court's construction and Oyster's separate

3    argument that the receiver is not part of the transmitter.  (Dkt. 127 at 21:16-22:26); (Ex. 1 at ¶161

4    (The receiver is ███████████████████████████████████████████.)  Moreover,

5    Oyster's imaginary box theory is belied by Dr. Goossen's concession that if the laser light is split

6    off to a component, then the laser is *not* contained in that component.  (Ex. 7 at 234:12-18.)

7           The legal conclusion that Ciena's single laser embodiment of coherent detection is

8    fundamentally different from anything disclosed in the Asserted Patents is not surprising.  The

9    patent applications for the asserted patents were filed approximately twenty years ago and "did

10   not invent coherent optical transmission."  (Ex. 14 at 109:6-8.)  "Oyster did not invent mixing an

11   optical signal with a local oscillator."  (*Id.* at 109:9-12.)  "And no Oyster invention includes

12   mixing an optical signal with a local oscillator."  (*Id.* at 132:8-11.)  In "2001, it would have been

13   *impossible* to build a coherent detection system based on the components that were available at

14   that time."  (*Id.* at 22:25-23:4.)

15          The plain language of all Asserted Claims, as construed, requires a transmitter physically

16   encompassing a laser.  Oyster's infringement theory attempts to put a round peg into a square

17   hole—an external laser whose light is split and shared between the transmitter and receiver

18   cannot be physically contained by the transmitter.  The very OIF standards *relied upon in*

19   *Oyster's infringement contention*s prove that the laser is external to the transmitter.

20          **3.      No Ciena Product Contains a Transmitter Having a Controller**

21          The asserted patents also require a "transmitter having a laser, a modulator, and *a*

22   *controller*," which has been construed as a "transmitter containing . . . *a controller*" where

23   "containing" means "physically encompassing."  (Dkt. No. 127 at 22:7-8, 22-26.)  In an effort to

24   satisfy this construction, Oyster asserts that a laser, a modulator, and a *driver* (allegedly a

25   "controller") all mounted on a daughterboard meets the Court's construction of a transmitter

26

27

28

1    "*having*" those components.

2    ████████████████████████████████████████████

3    ████████████████████████████████████████████

4    ████████████████████████████████████████████

5    ████████████████████████████████████████████

6    ████████████████████████████████████████████

7    (Ex. 1 at ¶¶159, 163.)  As seen in the excerpts above from Dr. Goossen's report, Oyster's

8    infringement theory clearly points to a driver to satisfy the claimed "controller" element.  (*See*

9    *also* Ex. 7 at 208:14-24 ("all the transmitter components are shown ██████████████████").)

10   Dr. Goossen distanced himself from his driver as a "controller" theory during his deposition and

11   declared, for the first time, that Ciena's DSP also satisfies the claimed "controller."  (*Id.* 188:15-

12   189:6.)[3]

13        Dr. Goossen's infringement analysis for the transmitter element also clearly states that

14   "the same ████████████ of the transceiver card [] contains ***all*** of the transmitter components."

15   (Ex. 1 at ¶161.)  Dr. Goossen similarly contended that components that are "located ***outside of***

16   ***the*** ████████████ that contains the transmitter" are not contained in the transmitter.  (*Id.*)

17   Again, Dr. Goossen changed his story in attempting to salvage infringement during his deposition

18   and asserted that "components of the transmitter, the laser, the controller and the modulator, don't

19   all have to be on the same ████████████."  (*Id.* at 218:22-24.)

20          a.      **Even Assuming, *Arguendo,* That a Driver is A Controller,**
                    **Which it is Not, Many Accused Products Do Not Have A**
21                  **Transmitter That Physically Encompasses A Driver**

22        This issue is dispositive for every Accused Instrumentality, except Ciena's "classic cards,"

23   ████████████████████████████████████████████████████████████████████

24   ████████████████████████  (Ex. 2 at ¶214 (Showing Accused Instrumentality Table).)  As

25   ───────────────────
     [3] Dr. Goossen's basis for changing his opinion is a single sentence in his report that repeats a Ciena
26   engineer's testimony that *Ciena* considers the ████ i.e., the DSP, on the **line card** to be a
     controller.  (Ex. 1 at ¶157 (citing Ex. 24 at ¶26:8-18).)  This misses the point, as the fact that a line
27   card or modem contains a DSP does not demonstrate that the *transmitter* in Ciena's products
     include a DSP.  Dr. Goossen offered no opinion in his report or deposition that the *transmitter* in
28   Ciena's products contained a DSP, and the fact that the line card contains a DSP does nothing to
     prove that the transmitter assembly contains a DSP (which it does not).  (Ex. 7 at ¶398:9-16.)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

discussed above, Dr. Goossen's report rightfully contends that the claimed transmitter

components, such as the "controller," cannot be located ▮▮▮▮▮▮▮▮▮ because the

▮▮▮▮▮▮ "contains *all* of the transmitter components." (Ex. 1 at ¶161.) As a result, Ciena

should indisputably prevail on summary judgment for every Accused Product that does *not*

include a driver (alleged "controller") on the ▮▮▮▮▮▮ (*i.e.* in the transmitter).

Dr. Goossen's expert report provides analysis only for Ciena's "classic cards." (Ex. 1 at

¶159[4]; *see also* Ex. 2 at ¶¶376-78; Ex. 7 at 220:15-221:12 ("I don't show a CR card" in my

transmitter analysis).)

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

(Ex. 1 at ¶159.) The CR cards that Dr. Goossen failed to provide any analysis for in his report

have the driver (alleged "controller") ▮▮▮▮▮▮▮▮▮ so they are not part of the transmitter

and they are certainly not ▮▮▮▮▮▮▮ with the other transmitter components.[5]

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

(Ex. 2 at ¶376.)

---

[4] In his expert report, Dr. Goossen clearly states that Ciena's classic card configuration as shown
in the figure above was "representative of the WaveLogic3 products." Confronted with this during
his deposition, Dr. Goossen implausibly changed course and contended that this was a "typo" and
not correct. (Ex. 7 at 209:25-210:22.) Beyond raising significant concerns regarding Dr. Goossen's
credibility, it bears noting that no supplementation of Dr. Goossen's report has been received by
Ciena.
[5] Two other Ciena products accused of infringement, the Wavelogic Nano and CFP2 pluggable
cards, were not properly accused of infringement in either Oyster's infringement contentions or in
Dr. Goossen's expert report, so no good faith basis exists for maintaining infringement allegations
regarding these products and summary judgment of no infringement should be granted if Oyster
refuses to voluntarily dismiss infringement allegations against these products.

Summary judgment of non-infringement is thus appropriate for every accused product having the driver (alleged "controller") located ███████████████ because the purported "controller" would not be contained in the transmitter. (Ex. 1 at ¶¶161.)

### b.    A Driver is Not A Controller

This issue is dispositive of every asserted claim. No reasonable jury could find a "driver" to be a "controller" as contended by Oyster. (Ex. 1 at ¶163 ("the transmitter contains a controller, labelled here as the quad 'Driver'").) "A driver is an amplifier. POSITAs uniformly understand that amplifiers 'amplify' signals." (Ex. 2 at ¶389.) Dr. Goossen even opines that "a linear amplifier," such as the ████████ driver, "produces an output voltage that is proportional to the input current." (Ex. 1 at ¶105.) When discussing systems other than the Accused Products, Dr. Goossen *distinguishes between* "*driver amplifiers*" and "*control electronics*." (*Id.* at ¶289,) thus demonstrating that Oyster's expert knows that a driver is not a controller.

Ciena's Vice President of Research and Development for the Optical Technology and Product Line, Mr. DiPerna, explained that the modulator is "an electro-optic device," and there is "digital logic that generated signals to drive the modulator." (Ex. 24 at 26:4-7.) The digital logic is "a device on WaveLogic 3.███ that "generates the signals." (*Id.* at 26:14-15.) Those signals then "**go into a driver**," which "**basically amplifies the signals** and imparts them on the modulator." (*Id.* at 26:14-18.) As can be seen, the ███████ *not* ████████ driver, controls the modulator in Ciena's products. (Ex. 1 at ¶157.) Consistent with Mr. DiPerna's testimony, the OIF document that Oyster relies on for its infringement contentions explains that "████ drivers convert low-level logic signals to signal levels required by the modulators." (Ex. 20 at 6; *see also* Ex. 18 at 7; Ex. 19 at 6-7.) Summary judgment of non-infringement is appropriate for every asserted claim because a simple amplifier is not a controller while the DSP, which does contain control functionality, is not contained in the transmitter.

### 4.    No Ciena Product Contains an Energy Level Detector

This issue is dispositive of every asserted claim except claims 36 and 37 of the '327 patent. Ciena's WaveLogic products do not include an energy level detector that "measure[s] an *energy level* of the optical signals," as required by claim 25 of the '327 patent (and similarly

required by claim 14 of the '898 patent).  During claim construction, Oyster urged the Court to adopt a construction where the energy level detector measures "power" instead of "an energy level," as claimed.  (Dkt. 113 at 5:14-21.)  The Court's tentative construction rejected Oyster's attempt to re-write the claim, and Oyster acquiesced.  (Dkt. 119 at 1:5-7.)

There is no dispute that energy and power are different.  Both Ciena's expert and Oyster's expert agree that power is the rate of energy per unit of time.  (Ex. 2 at 506; Ex. 1 at ¶178; Ex. 7 at 99:1-4.)  "Power is defined by energy *and* time."  (Ex. 2 at ¶506; Ex. 7 at 454:11-14.)  For example, just as speed equals distance per time (unit), power equals energy per time (unit).  One cannot determine the speed by simply knowing the distance traveled, and one cannot determine power by simply knowing the energy.  Speed is not equal to distance, and power is not equal to energy.  (Ex. 7 at 454:11-14 ("power" equals "energy *per unit time*."); 99:19-22 ("power has a time interval that energy does ***not*** have.").)  Power is measured in decibel milliwatts (dBm), while energy is measured in joules.  (Ex. 2 at ¶506; Ex. 7 at 99:11-13.)

Dr. Goossen's infringement position attempts to re-construe this term in the manner previously rejected by the Court.  Indeed, his infringement opinion rests upon his result-oriented conclusion that the patented "energy level detector measures optical *power*."  (Ex. 1 at ¶93.)  From that flawed conclusion, Dr. Goossen opines that the purpose of the alleged "energy level detector" in the Accused Products is to measure "power."  (*Id.* at ¶¶175-176; Ex. 7 at 452:24-453:2; 475:12-23.)  More specifically, Dr. Goossen asserts that a "PIN" photodiode in the accused products' receive chain is an "energy level detector."  (Ex. 1 at ¶174 (citing Ex. 16).)  At the same time, Dr. Goossen acknowledges that this photodiode monitors the "***power***" of the received signal.  (*Id.* at ¶176.)  This matters not to Dr. Goossen, as he opines that measuring signal power is the same thing as measuring "an energy level of the 'optical signals.'"  (*Id.* at ¶177) (redefining the measurement of power as "that is, to measure an energy level.")  Dr. Goossen's sleight of hand cannot change the undisputed plain language of the patent claims, as interpreted by this Court.  The claim language requires measurement of energy, not power.

Dr. Goossen's conclusory opinion suffers from yet another malady – it also contradicts the patents' claim language by rendering dependent claims meaningless.  For example, claim 25 of

1   the '327 patent requires measuring the optical signals' "energy level," while dependent claim 34

2   requires measuring the "optical power."  Similarly, claim 14 of the '898 patent requires

3   measuring the second optical signal's "energy level," while dependent claim 24 requires

4   measuring the "optical power."  Dr. Goossen's infringement opinion cannot succeed, as a matter

5   of law, because it re-construes this Court's construction in a manner that cannot be reconciled

6   with claim language.  The undisputed evidence shows that Ciena's WaveLogic products measure

7   the ███████████████████████████████████████████ (Ex. 12 at 170:1-

8   12.)

9       Dr. Goossen's conclusory assertion that power equals energy to a POSITA is contradicted

10  by his own definition of power as "an amount of energy per unit of time."  (Ex. 1 at ¶178.)  As

11  can be seen and as discussed above, one of ordinary skill in the art would understand that energy

12  and power are *different* because power contains a component of *time* that energy does not.[6]  Dr.

13  Goossen's conclusory testimony that power is somehow energy contradicts the undisputed

14  evidence and cannot defeat summary judgment.  The mere suggestion that facts are in

15  controversy, as well as conclusory testimony, is not sufficient to defeat summary

16  judgment.  *PersonalWeb Techs. LLC v. Int'l Bus. Machines Corp.*, 2017 WL 2180980, at *6

17  (N.D. Cal. May 18, 2017).

18      **B.      The Full Scope of the Claimed Receiver is Not Enabled**

19      This issue is dispositive of every asserted claim.  While the Asserted Patents enable

20  receiving amplitude modulated signals and converting those signals back into an electronic data

21  stream using a photodiode in a direct detect system (Ex. 25 at 1:25-28), there is no dispute that

22  the Asserted Patents do not enable the full scope of the claims as interpreted by this Court and

23  asserted by Oyster.

24      According to Dr. Goossen, rather than applying the Court's construction, which he calls

25  "impossible," "[a] POSITA instead would interpret the claims in light of her experience in the

26  field and understand that the ***full and complete demodulation function*** would exist in the system

27

28  ---

[6] Nor can Oyster resort to a doctrine of equivalents position, as Oyster has not advanced any
infringement positions under the doctrine of equivalents in this case.

1   . . ." (Ex. 1 at ¶76.)  Dr. Goossen's attempt to manufacture a material issue of factual dispute

2   regarding how the claimed "receiver" should be interpreted should be stricken as discussed in

3   Ciena's *Daubert* motions.[7]

4          The relevant inquiry is whether claims enable the *full scope* of a "receiver" as interpreted

5   by the Court, i.e., a receiver without a demodulator for the '898 patent, and argued by Oyster, i.e.,

6   a receiver with or without a demodulator for the '327 patent.  (Dkt. No. 121 at 19, 21, 23; Ex. 1 at

7   ¶276 ("a receiver with a demodulator" would "still infringe the '327 patent").)[8]  "[T]he

8   enablement inquiry necessarily depends on an interpretation of the claims."  *McRO, Inc. v.*

9   *Bandai Namco Games Am., Inc.*, 959 F.3d 1091, 1100 (Fed. Cir. 2020).  "[T]he specification

10  must enable the ***full scope*** of the claimed invention."  (*Id.* (emphasis added); *Nat'l Recovery*

11  *Techs., Inc. v. Magnetic Separation Sys., Inc.*, 166 F.3d 1190, 1195-96 (Fed. Cir. 1999) ("The

12  enablement requirement ensures that the public knowledge is enriched by the patent specification

13  to a degree at least commensurate with the scope of the claims.  The scope of the claims must be

14  less than or equal to the scope of the enablement.").)  If some portion of the claim scope is not

15  enabled, then the claim is invalid.  *MagSil Corp. v. Hitachi Global Storage Technologies, Inc.*,

16  687 F.3d 1377, 1381–83 (Fed. Cir. 2012); *Trustees of Boston University v. Everlight Electronics*

17  *Co. Ltd.*, 896 F.3d 1357, 1360, 1362 (Fed. Cir. 2018).

18         While Dr. Goossen's expert report contends that many parts of the asserted patents

19  provide enabling disclosure of a receiver with or without a demodulator (Ex. 4 at ¶¶8, 81-83, 95),

20

---

21  [7] Claim construction is a legal question within the province of the court.  *Markman v. Westview*
    *Instruments, Inc.*, 517 U.S. 370, 372 (1996).  "No party may contradict the court's construction to

22  a jury."  *Exergen Corp. v. Wal–Mart Stores, Inc.*, 575 F.3d 1312, 1321 (Fed. Cir. 2009).  In
    construing "receiver," the Court plainly excluded any receiver with a demodulator.  (Dkt. No. 127

23  at 11:21-23; 16:23-24.)  Thus, Dr. Goossen's opinions regarding the how a POSITA would interpret

24  the claimed receiver are irrelevant.  *See Liquid Dynamics Corp. v. Vaughan Co.*, 449 F.3d 1209,
    1224 n. 2 (Fed. Cir. 2006) (affirming exclusion of expert testimony as irrelevant where it was based

25  on an impermissible claim construction).

    [8] Oyster's prior expert, Dr. Lebby, opined that "an interferometer is part of the technology ***needed***
26  to demodulate" for Oyster's patents.  (Ex. 3 at ¶231.)  Dr. Goossen states in his report that that he
    *agrees* with Dr. Lebby.  (Ex. 4 at ¶104.)  No Ciena product includes an "interferometer" and the

27  Asserted Patents are silent about an "interferometer."  This is yet another reason for summary
    judgment—Ciena's WaveLogic products do not have components that Dr. Goossen contends are

28  "needed."

---

1    Dr. Goossen conceded during his deposition that the asserted patents are "completely mute as to

2    the receiver except inasmuch as it says it should be designed [] as appropriate for the optical

3    modulation technique used," so the patent "leaves it up to [a] POSITA to design the receiver."

4    (Ex. 7 at 691:15-692:12.)  Oyster's corporate representative, who is also the inventor, admitted

5    that the Asserted Patents "do not explain how to recover data from a phase-modulated [or

6    amplitude-modulated] signal without a demodulator."  (Ex. 14 at 78:17-79:3.)  He also admitted

7    that "[i]f someone wanted to know how to demodulate a phase-modulated signal using Oyster's

8    patented technology," then "they would have to go look at something different" from the Asserted

9    Patents.  (Ex. 14 at 130:18-25.)

10         Nevertheless, Dr. Goossen asserts that the scope of the claimed "receiver" in the '327

11   patent includes a receiver with a demodulator.  (Ex. 1 at ¶276.)  Assuming that Dr. Goossen's

12   allegation is correct, then Oyster must "show that such a claim [is] fully enabled. . ."  *Liebel–*

13   *Flarsheim*, 481 F.3d 1371, 1380 (Fed. Cir. 2007).  This is a challenge that Oyster cannot meet

14   given their repeated concessions to the Patent Office that the common specification of the

15   Asserted Patents fails to enable a "receiver" whose scope includes "a receiver with a

16   demodulator."  (Ex. 3 at ¶¶225-229.)

17         On top of this, Dr. Goossen concedes that a receiver "without" a demodulator is

18   "impossible."  (Ex. 4 at ¶¶76 (a receiver without a demodulator is "impossible"), 78 (the Court's

19   construction is not that of a POSITA), 79 (same); *see also* Ex. 3 at ¶199 ("every receiver that has

20   ever existed in an optical networking system has included a demodulator . . .  A receiver without a

21   demodulator would not be capable of operating in an optical communications system."); Ex. 14 at

22   78:17-79:3 (the Asserted Patents "do not explain how to recover data from a phase-modulated [or

23   amplitude-modulated] signal without a demodulator.").)  Given Dr. Goossen's admissions and the

24   above-described evidence, Dr. Goossen attempts to change the Court's construction by asserting

25   that the "demodulation function ***could*** start in the 'receiver' and be complete outside the

26   receiver."  (Ex. 4 at ¶ 78.)

27         Setting aside Dr. Goossen's futile attempt to walk back the constructions that Oyster

28   advocated for and obtained in this case, Oyster's difficulty in enabling the Asserted Claims is a

1   problem of its own making. *Liebel–Flarsheim*, 481 F.3d at 1380 ("The irony of this situation is

2   that Liebel successfully pressed to have its claims include a jacketless system, but, having won

3   that battle, it then had to show that such a claim was fully enabled, a challenge it could not

4   meet.")  Oyster pressed to have its claims include a receiver without a demodulator and now

5   cannot show that the patents' common specification, which Oyster's expert concedes is "mute"

6   about the design of the claimed receiver, enables the claimed receiver.  Because the patents share

7   a common specification that is "mute" about the receiver's details, Oyster simply cannot show

8   that the '327 patent enables a receiver *with* a demodulator while simultaneously enabling a

9   receiver *without* a demodulator.

### C.   Summary Judgment of No Indirect Infringement Is Warranted

10

11   Ciena should be granted summary judgment on indirect infringement because Oyster has

12   failed to prove that Ciena possessed a culpable state of mind.  Unlike direct infringement, which

13   is a strict liability offense and not dependent upon the defendant's mental state, liability for

14   indirect infringement requires that the defendant knew of the patent and that the accused acts

15   constitute patent infringement.  *See Commil USA, LLC v. Cisco Sys., Inc.*, U.S., 135 S.Ct. 1920,

16   1926 (2015) (citing *Global–Tech Appliances, Inc. v. SEB S.A.* 563 U.S. 754 (2011)).  This intent

17   standard applies to both types of indirect infringement: contributory infringement and induced

18   infringement.  *Global–Tech*, 563 U.S. at 763-65.  The intent standard cannot be met here, and

19   summary judgment is thus appropriate.

20   Under controlling law, a defendant can be found liable for indirect infringement only if it

21   has actual knowledge of the infringement or if it is willfully blind to the infringement.  *Global–*

22   *Tech,* 563 U.S. 754, 131 S.Ct. 2060, 2063, 179 L.Ed.2d 1167.  The doctrine of willful blindness

23   requires that "(1) the defendant must subjectively believe that there is a high probability that a

24   fact exists and (2) the defendant must take deliberate actions to avoid learning of that fact."  *Id.* at

25   2070.  With respect to the pre-suit time period, there can be no assertion of indirect infringement

26   because Ciena possessed no knowledge of the '327 and '898 patents.  Indeed, Oyster's Patent

27   L.R. 3.1(i) infringement contentions contain no allegation that Ciena was aware of the asserted

28

1   patents prior to the filing of the Complaint, so summary judgment of no pre-suit indirect

2   infringement should be uncontested.

3       Many courts have concluded that a lack of pre-suit knowledge of the patent *forecloses* an

4   allegation of indirect infringement as a matter of law.  *See Proxyconn v. Microsoft*, 2012 WL

5   1835680, at *7 (C. D. Cal. May 16, 2012) ("[A] complaint fails to state a claim for indirect patent

6   infringement where the only allegation that purports to establish the knowledge element is the

7   allegation that the complaint itself … establish the defendant's knowledge of the patent.");

8   *Zamora Radio, LLC v. Last.F.M., Ltd.*, 2010 WL 5140678, *12 (S. D. Fla. 2010).  This Court

9   adopted such a rule in a prior case.  *IPVenture, Inc. v. ASUS Computer Int'l*, No. 12-cv-04143-

10  JSW, Dkt. 159, 4-6 (N.D. Cal. Jan. 30, 2013).  Under the holding of *IPVenture*, summary

11  judgment of no indirect infringement is warranted here.

12      Regardless, the analysis for the period post-suit for indirect infringement also establishes

13  that indirect infringement cannot be proven here as a matter of law.  Patent L.R. 3.1(d) required

14  Oyster to provide a "description of the acts of the alleged indirect infringer that contribute to or

15  are inducing that direct infringement."  While Oyster provided a terse paragraph in response to

16  3.1(d), it failed to describe acts on the part of Ciena that contributed to or induced direct

17  infringement.  (*See* Ex. 23 at 2:2-12.)  Summary judgment is appropriate because Oyster has

18  submitted no evidence showing that Ciena possessed the requisite knowledge that acts of others

19  constituted infringement of the asserted patents or that such acts were actively encouraged.

20  *Global–Tech*, 563 U.S. at 763-64.[9]

21      Nor has Oyster presented any evidence which would allow a factfinder to determine that

22  Ciena was willfully blind to indirect infringement.  The evidence of record indicates that Ciena

23  possessed a good-faith, reasonable belief that the Accused Instrumentalities do not infringe and

24  thus could not have known of infringement or have been willfully blind of such infringement.

---

[9] While Oyster's expert, Dr. Goossen, attempted to offer opinions regarding indirect infringement, his opinions are facially deficient because they conclude that Ciena "knew or was willfully blind" without providing any facts or evidence whatsoever to support his conclusion. Ex. 1 at ¶270. Moreover, Dr. Goossen conceded in his deposition that he was not aware of Ciena's good faith defenses from the outset of the case forward, thus rendering his conclusory willful blindness opinion unsupportable. (Ex. 7 at 385:11-386:11.)

(*See generally* Ex. 13; *see also* Ex. 22 at 351-52 ████████████████████

████████████████████████████████████████████████████████████

████████████); Ciena's March 21, 2017 Answer to Oyster's Complaint at ¶¶6, 7, 66-11.)

Indeed, Ciena presented unrebutted corporate deposition testimony from a lead engineer, Dr.

Michael Frankel, demonstrating that Ciena ████████████████████████████████

████████████████████████████████████. (*See generally* Ex. 13.)

Thus, the unrefuted evidence of record establishes that willful blindness or knowledge of

infringement cannot be proven, and Ciena's good faith defenses warrant entry of summary

judgment. *See Ecolab, Inc. v. FMC Corp.*, 569 F.3d 1335, 1351 *amended on reh'g in part*, 366

Fed. Appx. 154 (Fed. Cir. 2009) (finding that a reasonable belief of non-infringement supported a

jury verdict that the defendant lacked the intent required for induced infringement); *Unwired

Planet, LLC v. Apple Inc.*, 106 F. Supp. 3d 1083, 1097 (N.D. Cal. 2015) (finding non-

infringement defense sufficient that no reasonable juror could find knowledge of indirect

infringement).

### D.   Substantial Damages are Released and/or Exhausted Based on the Prior Oyster-Fujitsu Agreement

Under prior adjudications binding on Oyster, Oyster exhausted and released its claims

against products of Fujitsu's customers—including Ciena—that contain Fujitsu modulators.

Oyster settled litigation against Fujitsu in 2018 by entering a settlement and license agreement

(the "OFA," Ex. 35) granting Fujitsu a broad license and release, and further granting Fujitsu

customers a release.  As a result, Fujitsu's supply of modulators to Ciena is authorized under the

OFA as both licensed and released.  In Oyster's litigation against other customers of Fujitsu, the

Federal Circuit affirmed that the very modulators at issue here satisfy the exhaustion test

referenced in the OFA, meaning that all claims against them are necessarily exhausted.

Furthermore, even under Oyster's narrowest reading of the OFA, such products have been

unequivocally released, regardless of exhaustion.  Oyster has fully litigated these issues and lost

and is now collaterally estopped from re-litigating the issues here.

### 1.   Prior Litigation and Rulings

1    Oyster initiated its litigation campaign in 2016 in the Eastern District of Texas, suing
2    Ciena (E.D. Tex. Case 2:17-cv-511), Fujitsu Network Communications, Inc. ("FNC") (2:16-cv-
3    01299, the "Fujitsu Litigation"),[10] Alcatel-Lucent USA, Inc. ("ALU") (2:16-cv-1297); Cisco
4    Systems, Inc. ("Cisco") (2:16-cv-1301), Infinera Corporation ("Infinera") (2:16-cv-1295); Coriant
5    American Inc., and Tellabs, Inc. ("Coriant") (2:16-cv-1302) and others.  The Court consolidated
6    these cases ("Texas Action") with Ciena's for all pretrial purposes.  *Oyster Optics, LLC v.*
7    *Coriant America Inc. et al*, No. 2:16-cv-1302 (E.D. Tex.) ("*Cisco-ALU*").  The Court
8    subsequently transferred the case against Ciena to this Court.  (Dkt. No. 30.)

9    *The Texas Court Decision:* The Texas Court granted summary judgment in favor of
10   Fujitsu customers, Cisco and ALU, holding on two alternative bases that Oyster granted Fujitsu's
11   customers a release for products having a Fujitsu modulator.  (Ex. 37 ("*Cisco-ALU I*").)  First, the
12   Court held that Oyster's claims were released even under Oyster's interpretation of the OFA
13   because "Oyster's litigating positions, contentions, and representations in the Fujitsu litigation
14   which preceded the OFA" showed that the Fujitsu components "embodied the essential features
15   of the patented invention and therefore meet the limitation Oyster argue[d] should be read into the
16   release."  (*Id*. at 12-17.)  Second, the Court found that the OFA alternatively released Oyster's
17   claims irrespective of the exhaustion test for the period of the release.  (*Id.* at 4-5, 7-17.)  The
18   Court rejected Oyster's argument that the "for further clarity" clause —which sets forward the
19   test for exhaustion in the definition of "Licensed Products"—constrained the release, and thus
20   held that customer's products incorporating Fujitsu components prior to the agreement's effective
21   date were released irrespective of exhaustion.  (*Id*. at 8-12.)[11]  The Court's ruling expressly
22   applies to the '327 Patent (*id.* at 2), and, as explained below, its reasoning and holding fully apply
23   to the '898 Patent.  The ruling applied not only to specific Fujitsu modulator model numbers

24

25   [10] Oyster filed a further action against Fujitsu just before settlement.  *Oyster Optics, LLC v.*
     *Fujitsu Network Communications Inc., et al.*, No. 2:18-cv-153 (E.D. Tex. April 17, 2018)
26   (collectively with the 2:16-cv-01299 action, the "Fujitsu Litigations")
27   [11]   The *Cisco-ALU I* court recently reaffirmed its interpretation of the OFA in Oyster's litigation
     against Infinera, another Fujitsu customer.  Ex. 36, *Oyster Optics, LLC, v. Infinera Corp. et al.,*
28   Case No. 2:19-CV-257, slip op., at (E.D. Tex. March, 23, 2021) (granting summary judgment on
     release) (*Infinera*).

1   ("FTM7992HM; FTM990HKA; FTM7977HQA") (Ex. 37 at 12) but any other Fujitsu

2   100G/400G LN Modulator.   Ex. 38, at 2.

3       *The Federal Circuit Decision*:  On appeal, the Federal Circuit affirmed.  *Oyster Optics,*

4   *LLC v. Alcatel-Lucent USA, Inc.*, 816 F. App'x 438 (Fed. Cir. 2020) ("*Cisco-ALU II*").   While

5   the Federal Circuit "express[ed] no view with respect to" whether the "for further clarity" clause

6   limited the release, it upheld the trial court's ruling that Oyster's litigating positions and

7   infringement contentions—as indicated in Oyster's claim charts, the testimony of Oyster's expert,

8   and argument by Oyster—established that the Fujitsu modulators substantially embodied the

9   patent claims.  *Id.* at 442-47.  The Federal Circuit's affirmance relied on cited pages 12-15 of the

10  Texas Court Decision identifying the decision further

11      **2.   Material Facts**

12        **a.  Oyster's Allegations Against Fujitsu Modulators**

13      In the Texas litigation, Oyster repeatedly accused Fujitsu modulators of directly infringing

14  the '898 and '327 Patents, defining the modulators as "Accused Instrumentalities" or "accused

15  products" that "infringe" the patents and satisfy all claim limitations.  First, Oyster did so in its

16  infringement contentions for both patents.  (Exs. 18 and 19; Ex. 25, ('327 Patent); Ex. 26 ('898

17  Patent).)  Second, Oyster's expert on infringement in the Fujitsu Litigation did so as to the '327

18  Patent.  (Ex. 39, 30-48.)  Third, Oyster filed a second complaint against Fujitsu that did so for

19  both patents.  Ex. 40, ¶¶ 6, 11, 27-35, 78-108 (Complaint in E.D. Tex. Case No. 2:18-cv-153).

20  Oyster's expert on exhaustion confirmed that Oyster's infringement contentions and Complaint

21  against Fujitsu accused the Fujitsu modulators of directly infringing.  Ex. 39.  The *Cisco-ALU I*

22  *and II* courts painstakingly analyzed and detailed these allegations before holding that they

23  established the exhaustion test acknowledged in the OFA.  *Cisco-ALU,* 12-17; 816 F. App'x at

24  445-446 (citing *Vanmoor v. Wal-Mart Stores, Inc.*, 201 F.3d 1363, 1366-67 (Fed. Cir. 2000);

25  *Evans Cooling Sys., Inc. v. Gen. Motors Corp.*, 125 F.3d 1448, 1451 (Fed. Cir. 1997).  As the

26  '898 Patent was no longer being asserted against Cisco or ALU by the time the *Cisco-ALU I & II*

27  ruled, the opinions are based on the '327 Patent.  *Id.*  Nonetheless, Oyster made the identical

28

1    operative allegations against the '898 Patent in the Fujitsu Litigations, as shown in the exhibits

2    cited in this section, and thus the prior decisions are not distinguishable.

3                                    **b.     OFA**

4            Effective May 22, 2018, Oyster and Fujitsu entered into the Oyster/Fujitsu Agreement

5    ("OFA").  (Ex. 35, OFA.)  The OFA granted a license and release resolving all claims between

6    Oyster and Fujitsu, including Oyster's infringement claims of the '327 and '898 Patents.  (Ex. 36;

7    Ex. 37, 2; Ex. 41; Ex. 42.)

8                                    **c.     Licensed Patents.**

9            Oyster asserted the '327 and '898 Patents here (Dkt. 1, Complaint) and owned them as of

10   the OFA's effective date (Ex. 43, Assignment Records).  Thus, each is a Licensed Patent.  OFA

11   ¶1.2; Ex. 37, 4 ('327 Patent a "Licensed Patent").

12                                   **d.     Fujitsu Optical Is an Affiliate**

13           Ciena sources modulators from Fujitsu Optical Components, Ltd, "Fujitsu Optical."  Ex.

14   44 (Ciena00073394, MPA).  Fujitsu Optical is an "Affiliate" of Fujitsu under the OFA.  Ex. 35,

15   § 1.1; Ex. 37, 3-4; 3; Ex. 40, at ¶6 (Fujitsu Limited controlling parent of Fujitsu Optical).  Ciena

16   sources Fujitsu Modulators from the same entity at issue in Federal Circuit and Texas Court

17   decisions.  (Exs. 36 and 37.)

18                                   **e.     Licensed Products**

19           Oyster accuses Ciena products that have the following Fujitsu modulators:

20   ███████████████████████████  (Ex. 1 at ¶360-75; Ex. 47; Ex. 48; Ex. 49 at 12:25-13:6 (all of

21   these products consume or use Fujitsu-supplied modulators).)  The ████████  modulator

22   was expressly named in Oyster's infringement allegations against Fujitsu.  The ████████

23   modulator is also a 100G/400G LN Modulator.  Ex. 2, ¶355.  Oyster's allegations against Fujitsu

24   modulators were not limited to the identified models but instead were directed to "100G/400G

25   LN Modulators" and "all variations, versions, editions, and applications" thereof.  (Ex. 50

26   (Infringement Contentions re Fujitsu).)  There are no material differences between the modulators

27   accused at issue here and the ones accused in the Fujitsu Litigations.  Ex. 2, ¶361.  These are the

28   same modulators or types of modulations expressly identified in the Federal Circuit and Texas

1  court opinions. *ALU I* (citing pages 12-15 of Texas court decision); *Cisco-ALU II* at 12-15

2  (repeated identification of Fujitsu Modulator FTM7977HQA and Fujitsu 100G/400G LN

3  Modulators).

4          **3.      Legal Standards**

5          **Collateral estoppel.** In the Ninth Circuit, collateral estoppel forecloses relitigation of an

6  issue if (1) the issue at stake is identical to the one alleged in the prior litigation; (2) the issue was

7  actually litigated by the party against whom preclusion is asserted in the prior litigation; and (3)

8  the determination of the issue in the prior litigation was a critical and necessary part of the earlier

9  judgment in the earlier action. *Town of N. Bonneville v. Callaway*, 10 F.3d 1505, 1508 (9th Cir.

10  1993) (citing *Clark v. Bear Stearns & Co.,* 966 F.2d 1318, 1320 (9th Cir. 1992)).

11          **Exhaustion.** "[A]ll or part of the right to exclude may be waived by granting a license,

12  which may be express or implied." *Carborundum Co. v. Molten Metal Equip. Innovations, Inc.*,

13  72 F.3d 872, 878 (Fed. Cir. 1995). "[T]he authorized sale of an article which is capable of use

14  only in practicing the patent is a relinquishment of the patent monopoly with respect to the article

15  sold." *United States v. Univis Lens Co*., 316 U.S. 241, 249 (1942) *Quanta Compuer, Inc. v. LG*

16  *Elecs., Inc*., 553 U.S. 617, 631 (2008) ("[E]xhaustion [is] triggered by the sale of [licensed

17  products] [where] their only reasonable and intended use was to practice the patent and [where]

18  they 'embodie[d] essential features of [the] patented invention.'").

19          **4.      Oyster's Claims Against Ciena's Products Incorporating Fujitsu
                    Modulators Are Exhausted**

20                  **a.      The Prior Holdings Are Dispositive**

21          The *Cisco-ALU I & II* holdings that Oyster's infringement allegations against Fujitsu's

22  Modulators establish the exhaustion test acknowledged under the "for further clarity" clause of

23  the OFA are dispositive and issue preclusion applies.   The holdings compel the conclusion that

24  Oyster's claims against Ciena's similarly situated products are fully exhausted.  As to the '327

25  Patent, the issues at stake are identical, were litigated against Oyster, and were critical and

26  necessary parts of the earlier judgment. *Bonneville*, 10 F.3d 1505, 1508.  Indeed, Ciena uses the

27  same Fujitsu 100G/400G LN Modulators (one with an identical model number) that the Federal

28  Circuit substantially embodied the '327 Patent by virtue of Oyster's infringement allegations in

1    its prior case against Fujitsu. *Cisco-ALU II*, 442-47.  Thus, Oyster is estopped from re-litigating

2    the arguments and positions it took and lost previously.  Furthermore, Oyster made the *identical*

3    infringement allegations against Fujitsu for the '898 Patent that underpinned the Federal Circuit's

4    decision as to the '327 Patent, and thus Oyster is also estopped by issue preclusion from re-

5    litigating those issues for the '898 Patent.

6                          **b.    Fujitsu's Authorized Sales of Modulators Exhaust Oyster's**
                                   **Claims**

7    
8            It is undisputed that the Asserted Patents are "Licensed Patents."  Oyster cannot dispute

9    that the Fujitsu Modulators are "Licensed Products" at least because they are "products,"

10   "components," and/or "devices" "made, sold, . . . or distributed" "at any time" by Fujitsu Optical,

11   an "Affiliate."  *See* § III.D.2, D; OFA ¶1.3; *Cisco-ALU I*, at 10-11.  It is further undisputed that

12   Ciena is a customer of Fujitsu Optical.  *See* § III.D.2.e.   The OFA broadly authorizes Fujitsu and

13   its Affiliates to sell Licensed Products (License Grant, OFA §4.1) and renders all of their prior

14   sales released (OFA §3.1).  Thus, all of Fujitsu's sales of modulators to Ciena are "authorized"

15   for purposes of exhaustion.  As explained above, the definition of "Licensed Products" contains a

16   "for further clarity" clause, which acknowledges the test of exhaustion.  (Ex. 35, §1.3; Ex. 37, 9.)

17   For the same reasons explained above, *Cisco-ALU I & II* found that Fujitsu modulators satisfied

18   the exhaustion test in the "for further clarity" clause for purposes of release, Fujitsu's authorized

19   sales of Fujitsu modulators (whether authorized under release or license) exhausted Oyster's

20   claims as to those modulator's incorporated into Ciena's accused products here.

21                          **c.    The OFA's Release Further Bars Oyster's Claims Against**
                                   **Ciena's Products Incorporating Modulators Prior to its**
                                   **Effective Date**

22   
23           In addition, the OFA's release (§3.1) releases the same Ciena accused products discussed

24   above, through the effective date of May 22, 2018, irrespective of Oyster's prior infringement

25   allegations against Fujitsu and the "for further clarity" sentence in the definition of "Licensed

26   Products."  Again, *Cisco-ALU I & II* are dispositive.  Fujitsu's product catalog, including any

27   Fujitsu Modulator, is a "Licensed Product" under the OFA because it is (1) at least either

28   "products," "components," and/or "hardware"; (2) was "made, sold, . . . or distributed" by, an

"Affiliate" under the OFA and Ciena is a customer because it sources the modulators from a Fujitsu Affiliate. Ex. 35, ¶¶ 1.3, 3.1; Ex. 37 at 5, 8, 10-11. The release in the OFA §3.1 extends to "customers," including Ciena. *Id.*

All of Oyster's arguments against the release were rejected in *Cisco-ALU I & II.* As found by the *Cisco-ALU I* court—a Texas court interpreting a Texas contract[12]—the "for further clarity" sentence does not limit the Release. *Id.* at 10-11. Accordingly, Ciena's products with either of the Fujitsu Modulators are released through May 22, 2018, irrespective of exhaustion. Collateral estoppel prevents Oyster from re-litigating its contrary contract interpretation, as that precise issue was litigated and decided against Oyster. *Bonneville*, 10 F.3d 1505, 1508. Nor can Oyster circumvent the preclusive effect of *Cisco-ALU I* due to the Federal Circuit affirming on the exhaustion basis of *Cisco-ALU I*: "[E]ven if the appellate court refrains from considering one of the grounds upon which the decision below rests, an affirmance of the decision below extends legal effects to the whole of the lower court's determination, with attendant collateral estoppel effect." *Diruzza v. Cty. of Tehama,* 323 F.3d 1147, 1156 (9th Cir. 2003) (quoting *Markoff v. N.Y. Life Ins. Co.*, 530 F.2d 841, 842 (9th Cir. 1976)). That is because an issue that is litigated and forms an alternative basis upon which the trial court's judgment rests renders each basis necessary and critical to the judgment. *See In re Westgate-California Corp.*, 642 F.2d 1174, 1176-77 (9th Cir. 1981) (citing J. Moore, *Federal Practice*, P 0.443(5) (2d ed. 1974)). The Ninth Circuit has not extended a contrary limitation on the defensive application of collateral estoppel. Accordingly, the products are additionally released without regard to the "for further clarity" clause in the OFA.

For the foregoing reasons, Ciena respectfully requests that the Court grant partial summary judgment on Ciena's exhaustion and release defenses under the OFA.

---

[12] Texas law governs the OFA's interpretation. OFA ¶9. Texas courts determine whether a contract is ambiguous as a question of law, *Nat'l Union Fire Ins. Co. v. CBI Indus.*, 907 S.W.2d 517, 518 (Tex. 1995), and if there is no ambiguity in a contract "its construction and meaning become a question of law for the court to determine." *Dedier v. Grossman*, 454 S.W.2d 231, 234 (Tex. App. 1970). The courts look to the four corners of the contract, ascertaining the parties' intent from the instrument as a whole. *E.g., Stine v. Stewart*, 80 S.W.3d 586, 589 (Tex. 2002) (per curiam).

DATED: May 21, 2021

By: /s/ Blair M. Jacobs
    Blair M. Jacobs
    blairjacobs@paulhastings.com
    Christina A. Ondrick
    christinaondrick@paulhastings.com
    John S. Holley
    johnholley@paulhastings.com
    PAUL HASTINGS LLP
    2050 M Street NW
    Washington, DC 20036
    Telephone:  (202) 551-1700
    Facsimile:  (202) 551-1705

    Thomas A. Counts (CA BN 148051)
    tomcounts@paulhastings.com
    PAUL HASTINGS LLP
    101 California Street, 48th Floor
    San Francisco, CA 94111
    Telephone:  (415) 856-7000
    Facsimile: (415) 856-7116

    RAYMOND W. STOCKSTILL (S.B. # 275228)
    beaustockstill@paulhastings.com
    PAUL HASTINGS LLP
    695 Town Center Drive, 17th Floor
    Costa Mesa, CA  92626
    Telephone:  (714) 668-6200
    Facsimile:  (714) 979-1921

    *Attorneys for Defendant*
    CIENA CORPORATION