# EXHIBIT B

13 F.4th 1361
United States Court of Appeals, Federal Circuit.

OMEGA PATENTS, LLC, Plaintiff-Cross-Appellant

v.

CALAMP CORP., Defendant-Appellant

2020-1793, 2020-1794
|
Decided: September 14, 2021

**Synopsis**

**Background:** Patent assignee brought action against competitor, alleging that competitor's location messaging unit system and products infringed its patents relating to multi-vehicle compatible control systems for vehicles with data bus. Following jury verdict finding that competitor directly infringed all four patents, induced infringement of two patents, and willfully infringed and awarding compensatory damages, the United States District Court for the Middle District of Florida, No. 6:13-cv-01950-PGB-DCI, Paul Byron, J., entered judgment. Competitor appealed. The Court of Appeals, Dyk, Circuit Judge, 920 F.3d 1337, affirmed in part, reversed in part, vacated in part, and remanded. On remand, following jury verdict finding that competitor directly infringed one patent, did not induce infringement of two patents, and did not willfully infringe, but that competitor's customers directly infringed one patent, and awarding royalty of $5.00 per unit, the District Court, Byron, J., denied competitor's combined motion for judgment as a matter of law, new trial, and remittitur, and awarded assignee ongoing royalty of $5.00 per unit. Competitor appealed and assignee cross-appealed.

**Holdings:** The Court of Appeals, Prost, J., held that:

[1] vacating jury's finding that competitor's customers directly infringed patent was warranted;

[2] technical expert's testimony with respect to enabling-data limitation did not go beyond scope of his expert report;

[3] sufficient evidence supported jury's finding that vehicle-device-code limitation was met;

[4] sufficient evidence supported jury's finding that enabling-data limitation was met;

[5] exclusion of rebuttal testimony by competitor's damages expert was contrary to mandate on remand; and

[6] royalty award of $5.00 per unit was unreasonable.

Affirmed in part, vacated in part, and remanded.

Hughes, Circuit Judge, filed opinion joining in part and dissenting in part.

**Procedural Posture(s):** On Appeal; Motion for Judgment as a Matter of Law (JMOL)/Directed Verdict; Motion for New Trial.

West Headnotes (37)

**[1]** **Courts** 🔑 Particular questions or subject matter

  The Federal Circuit reviews denial of post-trial motions for judgment as a matter of law (JMOL) and new trial in patent infringement actions under regional circuit law.

**[2]** **Federal Courts** 🔑 Taking case or question from jury; judgment as a matter of law
  **Federal Courts** 🔑 Taking case or question from jury; judgment as a matter of law

  Under Eleventh Circuit law, a district court's denial of judgment as a matter of law (JMOL) is reviewed de novo, viewing all evidence in the light most favorable to the nonmoving party, and a denial of a new trial is reviewed for abuse of discretion.

**[3]** **Federal Civil Procedure** 🔑 Evidence

  Under Eleventh Circuit law, judgment as a matter of law (JMOL) should be granted only when the plaintiff presents no legally sufficient evidentiary basis for a reasonable jury to find for him on a material element of his cause of action.

**[4]    Courts** 🔑 **Particular questions or subject matter**

The Federal Circuit applies regional circuit law when reviewing a district court's evidentiary rulings in a patent infringement action.

**[5]    Federal Courts** 🔑 **Reception of Evidence**

Under Eleventh Circuit law, evidentiary rulings are reviewed for abuse of discretion.

**[6]    Patents** 🔑 **Determination and Disposition of Cause**

Vacating jury's finding that competitor's customers directly infringed patent relating to multi-vehicle compatible control system for vehicles with communications bus was warranted on appeal, even though competitor was prevailing party as to patent assignee's claim of induced infringement of patent, assignee did not appeal judgment of no induced infringement, and jury's finding did not impose liability on competitor, since assignee's decision not to appeal from judgment frustrated competitor's right to appeal underlying finding that was intended to serve as predicate to assignee's induced-infringement theory, and competitor could suffer harm from jury's finding by way of indemnification claims, reputational injury, or attorney fees.

**[7]    Federal Courts** 🔑 **Judgment**

As an appellate tribunal, the Court of Appeals reviews judgments, not opinions or predicate findings.

**[8]    Federal Courts** 🔑 **Reversal or Vacation of Judgment in General**

A party who seeks review of the merits of an adverse ruling, but is frustrated by the vagaries of circumstance, ought not in fairness be forced to acquiesce in that ruling; under such circumstances, the equitable remedy of vacatur ensures that those who have been prevented from

obtaining the review to which they are entitled are not treated as if there had been a review.

**[9]    Patents** 🔑 **Expert witnesses and testimony**

Technical expert's testimony in patent infringement action, with respect to enabling-data limitation of patent relating to multi-vehicle compatible tracking unit for vehicles with data bus, that accused products had interface for downloading enabling data which included scripts that informed products how to operate and that scripts included "configuration information specifically in terms of the executable instructions" and "stored table of information" from which one could derive whether there was a "match or not in terms of bus discovery" did not go beyond scope of his expert report, where expert disclosed in his report that accused products could be configured to receive "firmware or scripts with programming instructions or enabling data" via one or more downloading interfaces.

**[10]    Patents** 🔑 **Particular fields of invention**

Sufficient evidence supported jury's finding, in action for direct infringement of patent relating to multi-vehicle compatible tracking unit for vehicles with data bus, that claim limitation reciting communication with at least one vehicle device using at least one corresponding vehicle device code was met; technical expert testified that accused products received a signal from a vehicle's engine control unit and that engine control unit was a vehicle device, and competitor's corporate representative testified that accused products were able to read a signal from a vehicle device off the bus.

**[11]    Patents** 🔑 **Particular fields of invention**

Sufficient evidence supported jury's finding, in action for direct infringement of patent relating to multi-vehicle compatible tracking unit for vehicles with data bus, that claim limitation reciting downloading interface for permitting downloading of enabling data related to at

least one corresponding vehicle device code was met; technical expert testified that accused products had interface for downloading enabling data which included scripts that informed products how to operate and that scripts included instructions and data from which one could determine which bus was being discovered and what units were on that bus.

**[12]  Patents** 🔑 Trial, Hearing, and Determination

Competitor waived argument on appeal that jury's finding of direct infringement of patent relating to multi-vehicle compatible tracking unit for vehicles with data bus was impermissibly tainted by patent assignee's allegedly improper theory of infringement based on stored device code that originated at an accused product itself rather than vehicle device, where competitor did not object when assignee allegedly presented theory during closing argument, did not ask for limiting jury instruction, and did not object to evidence that assignee presented in support of theory.

**[13]  Federal Courts** 🔑 Instructions

A jury is presumed to follow jury instructions.

1 Cases that cite this headnote

**[14]  Patents** 🔑 Remand; mandate

District Court's decision on remand based on law-of-the-case doctrine to preclude competitor's damages expert from offering rebuttal testimony was contrary to Court of Appeals' mandate, warranting new trial on damages for infringement of patent relating to multi-vehicle compatible tracking unit for vehicles with data bus; Court of Appeals explicitly instructed both parties "to achieve clarity by clearly presenting evidence" in the retrial on remand as to compensatory damages so that Court of Appeals could "effectively fulfill its appellate function in any further review arising from the retrial," competitor timely raised issue of its expert's rebuttal testimony before

retrial, and decision to exclude expert's rebuttal testimony before first trial was not on the merits.

1 Cases that cite this headnote

**[15]  Courts** 🔑 Particular questions or subject matter

The law of the case is a procedural matter not unique to patent law to which the Federal Circuit applies the precedent of the regional circuit in which the case arose.

1 Cases that cite this headnote

**[16]  Patents** 🔑 Subsequent appeals

Under Eleventh Circuit law, a district court's application of the law-of-the-case doctrine in a patent infringement action is reviewed de novo.

**[17]  Federal Courts** 🔑 Mandate

The "mandate rule" provides that issues actually decided on appeal—those within the scope of the judgment appealed from, minus those explicitly reserved or remanded by the court— are foreclosed from further consideration.

**[18]  Courts** 🔑 Particular questions or subject matter

The Federal Circuit reviews a district court's interpretation of its mandate in a patent infringement action de novo under Federal Circuit law.

**[19]  Federal Courts** 🔑 Mandate

In interpreting a mandate of the Court of Appeals, both the letter and the spirit of the mandate must be considered.

1 Cases that cite this headnote

**[20]  Federal Courts** 🔑 Mandate

A district court's actions on remand should not be inconsistent with either the letter or the spirit of the mandate.

1 Cases that cite this headnote

[21]    **Federal Courts**  🔑  Law of the case in general

Ordinarily, under Eleventh Circuit law-of-the-case doctrine, a legal decision made at one stage of the litigation, unchallenged in a subsequent appeal when the opportunity existed, becomes the law of the case for future stages of the same litigation, and the parties are deemed to have waived the right to challenge that decision at a later time.

[22]    **Federal Courts**  🔑  Mandate

Law-of-the-case doctrine does not necessarily apply where a mandate permits consideration on remand of an otherwise-waived issue.

[23]    **Federal Courts**  🔑  Mandate

When the dispositive issue on appeal is whether the district court misinterpreted the Court of Appeals' mandate, no deference is due.

[24]    **Patents**  🔑  Profits and damages

The patentee must in every infringement case give evidence tending to separate or apportion patentee's damages between the patented feature and the unpatented features.

1 Cases that cite this headnote

[25]    **Patents**  🔑  Damages

Where a royalty is at issue for patent infringement, no matter what the form of the royalty, the patentee must take care to seek only those damages attributable to the infringing features.

1 Cases that cite this headnote

[26]    **Patents**  🔑  Elements, measure, and amount

Where multi-component products are involved when calculating damages for patent infringement, the ultimate combination of

royalty base and royalty rate must reflect the value attributable to the infringing features of the product, and no more.

1 Cases that cite this headnote

[27]    **Patents**  🔑  Elements, measure, and amount

When the accused infringing products have both patented and unpatented features, measuring the value attributable to the infringing features of the product for a royalty award requires a determination of the value added by such features.

2 Cases that cite this headnote

[28]    **Patents**  🔑  Elements, measure, and amount

A patentee may assess damages based on the entire market value of an infringing product with both patented and unpatented features only where the patented feature creates the basis for customer demand or substantially creates the value of the component parts.

1 Cases that cite this headnote

[29]    **Patents**  🔑  Elements, measure, and amount

For built-in apportionment to apply when a license is used as the basis for determining the appropriate royalty as damages for patent infringement, the license must be sufficiently comparable, in that principles of apportionment were effectively baked into the purportedly comparable license.

3 Cases that cite this headnote

[30]    **Patents**  🔑  Profits and damages

The patentee has the burden of proving damages for infringement, and where licenses are at issue when calculating a royalty award, that includes the burden to prove that the licenses were sufficiently comparable.

[31]    **Patents**  🔑  Elements, measure, and amount

Patent assignee was required to show apportionment when using accused products as royalty base for calculating royalty award as damages for infringement of patent relating to multi-vehicle compatible tracking unit for vehicles with data bus, even if accused products had same components as those set forth in asserted claims, since accused products had conventional components that were not inventive aspects of patent.

**[32]     Patents** 🔑 Reasonable royalty; hypothetical negotiation

Royalty award of $5.00 per unit for infringement of patent relating to multi-vehicle compatible tracking unit for vehicles with data bus was unreasonable; multi-vehicle-compatibility feature of accused products did not drive demand for the entire product, patent assignee's licensing program under which licensing fee was $5 per unit regardless of which patents were included did not account for apportionment between patented improvement added to accused products and conventional features of products, and assignee did not adequately account for substantial distinguishing facts between proffered licenses which involved numerous patents and hypothetical negotiation over a single-patent license to subject patent.

3 Cases that cite this headnote

**[33]     Federal Courts** 🔑 Sufficiency of evidence

Failure to object to admission of damages expert evidence does not act as waiver as to a challenge to the sufficiency of the evidence for the jury to award damages.

**[34]     Patents** 🔑 Reasonable royalty; hypothetical negotiation

Allegedly comparable licenses being used as the basis for determining a reasonable royalty as damages for patent infringement may cover more patents than are at issue in the action, include cross-licensing terms, or cover foreign intellectual property rights.

**[35]     Patents** 🔑 In general;  utility

US Patent 6,346,876, US Patent 🚩7,671,727. Cited.

**[36]     Patents** 🔑 In general;  utility

US Patent 8,032,278. Infringed.

**[37]     Patents** 🔑 In general;  utility

US Patent 🚩6,756,885. Not Infringed.

**\*1365**  Appeals from the United States District Court for the Middle District of Florida in No. 6:13-cv-01950-PGB-DCI, Judge Paul G. Byron.

**Attorneys and Law Firms**

Megan S. Woodworth, Venable LLP, Washington, DC, argued for plaintiff-cross-appellant. Also represented by Brian R. Gilchrist, Ryan Santurri, Allen, Dyer, Doppelt + Gilchrist, PA, Orlando, FL.

Constantine L. Trela, Jr., Sidley Austin LLP, Chicago, IL, argued for defendant-appellant. Also represented by Stephanie P. Koh, Leif E. Peterson, II, Thomas D. Rein.

Before Dyk, Prost [*], and Hughes, Circuit Judges.

**Opinion**

Opinion joining in part and dissenting in part filed by Circuit Judge Hughes.

Prost, Circuit Judge.

CalAmp Corp. ("CalAmp") appeals from a judgment of infringement and award of damages as to U.S. Patent No. 8,032,278 ("the '278 patent"). Omega Patents, LLC ("Omega") cross-appeals the district court's determination of the post-verdict royalty rate. We affirm the judgment of infringement of the asserted claims of the '278 patent but vacate and remand for **\*1366** a new trial on damages. Omega's cross-appeal is therefore moot.

The jury further found that CalAmp did not induce infringement of the asserted claims of 🔖U.S. Patent No. 6,756,885 ("the '885 patent") and Omega does not appeal that determination. CalAmp, however, appeals the jury's underlying finding of direct infringement of the asserted claims by CalAmp's customers. We vacate the jury's finding of direct infringement.

BACKGROUND

This patent-infringement case is before us for a second time, returning after a second jury trial. In the second trial, like the first, Omega accused CalAmp of infringing certain claims of the '278 patent, the 🔖'885 patent, and U.S. Patent Nos. 6,346,876 ("the '876 patent") and 🚩7,671,727 ("the '727 patent").

Omega is listed as the assignee of the four patents in suit. Omega's president, Kenneth Flick, is listed as the sole inventor of each patent. The patents generally relate to multi-vehicle-compatible systems that can remotely control various vehicle functions (for example, remote vehicle starting), *see, e.g.,* 🔖'885 patent col. 3 ll. 32–34, and read the status of various vehicle devices (for example, battery health), *see, e.g.,* '278 patent col. 18 ll. 56–57. The systems can also be used to notify the driver, or the driver's employer, if certain conditions occur (for example, speeding). *See, e.g., id.* at col. 9 ll. 26–33. To be compatible with different vehicles, the controller must determine the appropriate protocol to use in communicating with a particular vehicle data bus (an internal communications network), which is connected to various devices in the vehicle. This process involves the controller first sending out a series of signals using different protocols to the vehicle's data bus, which relays those signals to the vehicle's devices. If a vehicle device recognizes one of the signals, it can then respond with its own signal, which travels to the data bus and then back to the controller. The controller relies on this response to determine the appropriate protocol to use for further communication with the vehicle devices. *See, e.g.,* 🔖'885 patent col. 4 ll. 9–23, col. 9 ll. 21–55.

CalAmp operates in the telematics industry, assisting businesses and government entities in tracking and collecting data for their assets (for example, a fleet of vehicles). CalAmp sells its Location Messaging Unit ("LMU") products, which are multi-vehicle-compatible devices that include a GPS receiver for vehicle tracking. The products at issue in this appeal are the LMU-3000, LMU-3030, and LMU-3050 ("the LMUs" or "the Accused LMUs"). The LMUs connect to a vehicle's data communication bus via the onboard diagnostics port and can retrieve information (for example, battery health or vehicle speed) from the vehicle's engine control unit ("ECU") via the vehicle's data bus. Further, the LMUs can relay information (for example, a speeding notification) to CalAmp's servers, which enables businesses to remotely monitor various aspects of their vehicles.

In the first trial, the jury found all asserted claims not invalid, found that CalAmp directly infringed certain claims of each of the four patents, found that CalAmp induced its customers to infringe certain claims of the 🔖'885 and '876 patents, found willful infringement, and awarded compensatory damages. Following the first trial, CalAmp appealed. In that prior appeal, we affirmed the judgment as to no invalidity of all four patents and as to **\*1367** CalAmp's direct infringement of original claim 11 (amended claim 1) of the 🚩'727 patent; [1] we reversed the judgment as to CalAmp's direct infringement of the asserted claims of the 🔖'885 and '876 patents; and we vacated the judgment and remanded for a new trial as to induced infringement of the asserted claims of the 🔖'885 and '876 patents and CalAmp's direct infringement of the asserted claims of the '278 patent. *Omega Pats., LLC v. CalAmp Corp.,* 920 F.3d 1337, 1353–54 (Fed. Cir. 2019). We also vacated the judgment and remanded for a new trial as to compensatory damages and the jury's willfulness finding. *Id.* at 1354.

On remand, the district court conducted a second jury trial, in which Omega accused CalAmp of directly infringing claims 1–6, 8, 11–14, 16, 18–19, and 21 of the '278 patent and of inducing CalAmp's customers to infringe claims 1–3, 12, and 14 of the 🔖'885 patent and claims 1, 3–5, 14, and 16 of the '876 patent. Omega sought damages for infringement of these claims and for CalAmp's direct infringement of amended claim 1 of the 🚩'727 patent (which was affirmed in the first appeal). Omega also alleged willful infringement of each of the four patents. This time, the jury found that CalAmp directly infringed each asserted claim of the '278 patent but that CalAmp did not induce infringement of any of the asserted claims of the 🔖'885 or '876 patents. J.A. 27–31. (The jury did find that CalAmp's customers directly

infringed the asserted claims of the ⚑ '885 patent. J.A. 28–29.) The jury further found that 917,222 units of the LMUs infringed the '278 patent. J.A. 32. The jury awarded a $5.00-per-unit royalty for this infringement, totaling a $4,586,110 damages award. [2] J.A. 32–33. The jury did not find willful infringement of any of the four patents.

The district court upheld the jury's verdict, denying CalAmp's combined motion for judgment as a matter of law ("JMOL"), a new trial, and remittitur. J.A. 25–26. In addition, the district court awarded Omega an ongoing royalty of $5.00 per unit infringing the '278 patent. J.A. 14–22.

Only the ⚑ '885 and '278 patents are at issue in this appeal. As to the ⚑ '885 patent, claim 1 is representative [3] and recites:

1. A control system for a vehicle comprising a data communications bus and at least one vehicle device connected thereto, the control system comprising:

a transmitter and a receiver for receiving signals from said transmitter; and

a multi-vehicle compatible controller cooperating with said transmitter and said receiver and for storing a set of device codes for a given vehicle device for a plurality of different vehicles, for reading a device code from the data communications bus, and for determining a match between a read device code and the stored device codes to thereby provide compatibility with a plurality of different vehicles.

As to the '278 patent, claim 1 is representative **\*1368** [4] and recites:

1. A multi-vehicle compatible tracking unit for a vehicle comprising a vehicle data bus extending throughout the vehicle, the multi-vehicle compatible tracking unit comprising:

a vehicle position determining device;

a wireless communications device;

a multi-vehicle compatible controller for cooperating with said vehicle position determining device and said wireless communications device to send vehicle position information;

said multi-vehicle compatible controller to be coupled to the vehicle data bus for communication thereover with at least one vehicle device using at least one corresponding vehicle device code from among a plurality thereof for different vehicles; and

a downloading interface for permitting downloading of enabling data related to the at least one corresponding vehicle device code for use by said multi-vehicle compatible controller.

DISCUSSION

CalAmp appeals (1) the district court's denial of JMOL that CalAmp's customers did not directly infringe the ⚑ '885 patent (and in the alternative, CalAmp requests that we vacate the direct-infringement finding); (2) the district court's denial of JMOL and a new trial on CalAmp's infringement of the '278 patent; and (3) the district court's denial of remittitur and a new trial as to damages for the '278 patent. Omega cross-appeals the district court's determination of the ongoing royalty rate for infringement of the '278 patent. We have jurisdiction under 28 U.S.C. § 1295(a)(1).

**[1] [2] [3] [4] [5]** We "review denial of post-trial motions for JMOL and new trial under regional circuit law." ⚑ *Wordtech Sys., Inc. v. Integrated Networks Sols., Inc.*, 609 F.3d 1308, 1312 (Fed. Cir. 2010). Under Eleventh Circuit law, we review a district court's denial of JMOL de novo, viewing all evidence in the light most favorable to the nonmoving party, and we review denial of a new trial for abuse of discretion. ⚑ *Hicks v. City of Tuscaloosa*, 870 F.3d 1253, 1257 (11th Cir. 2017). JMOL should be granted "only when the plaintiff presents no legally sufficient evidentiary basis for a reasonable jury to find for him on a material element of his cause of action." *Howard v. Walgreen Co.*, 605 F.3d 1239, 1242 (11th Cir. 2010) (cleaned up). We likewise apply regional circuit law when reviewing a district court's evidentiary rulings. ⚑ *Odetics, Inc. v. Storage Tech. Corp.*, 185 F.3d 1259, 1276 (Fed. Cir. 1999). Under Eleventh Circuit law, we review evidentiary rulings for abuse of discretion. *Seamon v. Remington Arms Co.*, 813 F.3d 983, 987 (11th Cir. 2016).

I. DIRECT INFRINGEMENT OF THE 📙 '885
PATENT BY CALAMP'S CUSTOMERS

**[6]** CalAmp successfully defended Omega's claim of induced infringement. The jury found that CalAmp did not induce infringement of the asserted claims of the 📙 '885 patent, and Omega did not appeal this finding. CalAmp does appeal, however, an underlying finding of *direct* infringement by CalAmp's customers—specifically, **\*1369** the district court's denial of JMOL that those customers did not directly infringe. The direct-infringement finding did not itself impose liability on CalAmp but instead was intended to serve as a predicate to Omega's induced-infringement theory. In the alternative, CalAmp requests that we vacate the jury's finding if we do not consider the merits.

**[7]** Because CalAmp is the prevailing party as to Omega's claim of induced infringement of the 📙 '885 patent, we decline to review the merits of CalAmp's appeal of the JMOL denial regarding direct infringement by its customers. *See*
📙 *Mass. Inst. of Tech. v. Abacus Software*, 462 F.3d 1344, 1350 (Fed. Cir. 2006) ("An appeal is not an opportunity to bring before the appellate court every ruling with which one of the parties disagrees without regard to whether the ruling has in any way impacted the final judgment."). Here, the final judgment of no induced infringement is not before us, and it is a "well-established rule that, as an appellate tribunal, we review judgments, not opinions" or predicate findings.
📙 *Droplets, Inc. v. E*TRADE Bank*, 887 F.3d 1309, 1321 (Fed. Cir. 2018); *see Tesco Corp. v. Nat'l Oilwell Varco, L.P.*, 804 F.3d 1367, 1379 (Fed. Cir. 2015) (declining "to address the predicate findings in the trial court's opinion").

Nonetheless, we agree with CalAmp that the jury's direct-infringement finding should be vacated. Because Omega did not appeal the final judgment of no induced infringement, "frustrat[ing] [CalAmp's] right to appeal," 📙 *Camreta v. Greene*, 563 U.S. 692, 698, 131 S.Ct. 2020, 179 L.Ed.2d 1118 (2011), the question of whether CalAmp's customers directly infringed the asserted claims of the 📙 '885 patent is moot. Indeed, Omega acknowledges that "the question of customer infringement [is] irrelevant" at this stage of the case. Cross-Appellant's Br. 13. And CalAmp asserts (without opposition) that it could suffer harm from the jury's finding of direct infringement by way of indemnification claims, reputational

injury, or attorneys' fees, Appellant's Br. 33 n.8, 35; *see* J.A. 23140–41, therefore retaining the requisite personal stake in the outcome.

**[8]** As the Supreme Court has stated, "[a] party who seeks review of the merits of an adverse ruling, but is frustrated by the vagaries of circumstance ... ought not in fairness be forced to acquiesce in that ruling." 📙 *Camreta*, 563 U.S. at 712, 131 S.Ct. 2020 (cleaned up). Under such circumstances, "[t]he equitable remedy of vacatur ensures that those who have been prevented from obtaining the review to which they are entitled are not treated as if there had been a review." 📙 *Id.* (cleaned up). Here, appellate review is unavailable to CalAmp through no action or fault of its own. Accordingly, to "expunge[ ] an adverse decision that would be reviewable had this [issue] not become moot," 📙 *id.* at 712 n.10, 131 S.Ct. 2020, we vacate the jury's finding of direct infringement of the asserted claims of the 📙 '885 patent by CalAmp's customers.

II. CALAMP'S INFRINGEMENT OF THE '278 PATENT

CalAmp challenges the district court's denial of JMOL and a new trial as to infringement of the asserted claims of the '278 patent on two principal grounds: (1) that the district court improperly permitted Omega's technical expert, Joseph McAlexander, to testify beyond the scope of his expert report; and (2) that Omega presented an improper "device code" theory to the jury upon which the jury relied **\*1370** and that Omega failed to present evidence that two claim limitations were met. We conclude that the district court properly denied JMOL and a new trial.

A. *Scope of Mr. McAlexander's Testimony*

**[9]** CalAmp argues that the district court improperly permitted Mr. McAlexander to testify beyond the scope of his expert report with respect to the "enabling data" limitation of the '278 patent. We disagree.

At trial, Mr. McAlexander testified that the LMUs have an interface for "download[ing] enabling data," J.A. 23529, and that the enabling data is, for example, "scripts" that "inform[ ] the LMU device how it is to operate and that information is downloaded and is provided in memory in the flash," J.A. 23531. Mr. McAlexander further testified that

Case 4:17-cv-05920-JSW Document 248-2 Filed 10/07/22 Page 10 of 22

"several different things" are part of the scripts, including "configuration information specifically in terms of the executable instructions" and "a stored table of information from which you can derive whether or not you have a match or not in terms of bus discovery, device discovery." J.A. 23531. CalAmp objected to this "enabling data" testimony on the basis that it was not disclosed in Mr. McAlexander's expert report. J.A. 23532. The district court considered and overruled CalAmp's objection, finding that the expert report provided a sufficient foundation for the challenged testimony. J.A. 23533–34.

Mr. McAlexander's report states that the LMUs "include[ ] a downloading interface for permitting downloading of enabling data" and that the LMUs can be configured to receive "firmware or scripts with programming instructions or enabling data" via one or more downloading interface. J.A. 8666. We conclude that these disclosures provided enough notice to CalAmp "to prepare [its] case[ ] adequately and to prevent surprise." *Guevara v. NCL (Bahamas) Ltd.*, 920 F.3d 710, 719 (11th Cir. 2019) (quoting *Reese v. Herbert*, 527 F.3d 1253, 1266 (11th Cir. 2008)). Indeed, in a pretrial deposition, CalAmp questioned Mr. McAlexander on the "enabling data" disclosures of his expert report, with Mr. McAlexander responding in line with his expert report and much as he ultimately testified at trial. *See* J.A. 3902–04 (deposition transcript); J.A. 23531 (trial transcript). Accordingly, we see no abuse of discretion in the district court's evidentiary ruling that the subject matter of the challenged testimony was within the scope of Mr. McAlexander's report. *See Seamon*, 813 F.3d at 987.

B. *The "Device Code" Issue and Associated Limitations*

CalAmp also contends that Omega failed to show that the LMUs practice the "corresponding vehicle device code" and "enabling data related to the at least one corresponding vehicle device code" limitations of claim 1 of the '278 patent. CalAmp further contends that the jury's infringement finding is impermissibly tainted because "Omega improperly argued [to the jury] that a 'device code' (such as a stored device code) could originate from the Accused LMUs, ignoring the claim constructions that a device code is a signal *from* a vehicle device and that the LMU is *not* a vehicle device." Appellant's Br. 38–39 (emphases in original). CalAmp's theory is that "[t]he jury's finding that the Accused LMUs infringe the '278 patent can only rest on Omega's improper 'device code'

theory." Appellant's Br. 37. We disagree with CalAmp on each of these matters.

**\*1371** First, some background. Before the first trial, the district court construed the term "device code" in the '885 and '876 patents to mean a "signal from a vehicle device." J.A. 798–800. The district court was not asked to construe "device code" with respect to the '278 patent. The district court was asked to construe the term "vehicle device" as used in the '885, '876, '727, and '278 patents but declined to do so—an issue that we confronted in the first appeal. *See Omega Pats.*, 920 F.3d at 1346. (Claim construction of "device code" was not at issue in the first appeal.) We held that the district court improperly declined to define the term "vehicle device" and that the proper construction of this term is an "electrical or electronic component in a vehicle that can be controlled and/or the status thereof read." *Id.* at 1346, 1347. We further held that this construction excludes the LMUs as "vehicle devices." *Id.* at 1347. And because "Omega's primary theory at [the first] trial was that the LMU was a 'vehicle device' and the signals it sent to the ECU were infringing 'devices codes,' " we set aside the jury's verdict of infringement of all asserted claims of the '885 patent. *Omega Pats.*, 920 F.3d at 1347. But we explained that a new trial was warranted because "Omega also presented evidence that the signal sent from the ECU (an uncontested 'vehicle device') to the LMU could satisfy the 'device code' limitation." *Id.* We then noted that the asserted claims of the '278 patent have a "device code" limitation and concluded that a new trial on direct infringement by CalAmp of the '278 patent was warranted for the same reasons as discussed with respect to the '885 patent. *Omega Pats.*, 920 F.3d at 1349.

CalAmp's fundamental problem in this appeal as to infringement, therefore, is that the ECU is indisputably a "vehicle device" that communicates with the LMUs. *See, e.g.*, *id.* at 1347; Appellant's Br. 5 ("The Accused LMUs ... communicate over the vehicle's data bus to obtain data ... from the ... ECU.").

**[10]** Claim 1 of the '278 patent recites "communication ... with at least one vehicle device using at least one corresponding vehicle device code." CalAmp argues that Omega failed to present evidence that the LMUs use a "device code" that meets the "device code" construction, thereby failing to show that the LMUs practice the "corresponding vehicle device code" limitation. *See* Appellant's Br. 39–41; Appellant's Reply Br. 27–28. CalAmp is incorrect. The parties

agree that the "device code" element is met by a "signal from a vehicle device." *See* Appellant's Br. 21; Cross-Appellant's Br. 20. And in the retrial, the jury was presented with evidence that the LMUs receive a signal from the ECU, a vehicle device. For example, the jury heard testimony from Mr. McAlexander that the "[v]ehicle device is the actual control unit, the ECU" in the context of infringement of claim 1 of the 278 patent. J.A. 23528; *see* J.A. 23513, 23523–24. And the jury was played deposition testimony from Gallin Chen, one of CalAmp's corporate representatives, that "the LMU[-]3000 is able to read a signal *from* a vehicle device off the bus." J.A. 19522 (emphasis added); *see* J.A. 19488. Indeed, in discussing the "vehicle device" of claim 1, Mr. McAlexander stated to the jury that "the deposition testimony that's been played, Chen in particular, verified this." J.A. 23528; *see* J.A. 23471–72 (McAlexander testifying that the LMU-3000, LMU-3030, and LMU-3050 "operate the same way" from "the claimed invention standpoint"). Accordingly, we conclude that there was sufficient evidence for the jury **\*1372** to find the "corresponding vehicle device code" limitation met.

[11]  CalAmp further argues that Omega failed to show the "enabling data related to the at least one corresponding vehicle device code" limitation of claim 1 of the 278 patent. CalAmp presents two theories, each of which fails. First, CalAmp ties this limitation to its "device code" argument. *See, e.g.*, Appellant's Br. 41 (arguing that "having failed to identify the 'corresponding vehicle device code,' McAlexander's testimony also necessarily failed to identify the 'enabling data' that must be 'related to the at least one corresponding vehicle device code' "). This argument fails because, as discussed, the jury was presented with sufficient evidence to find the "corresponding vehicle device code" limitation met. Second, CalAmp asserts that the jury's finding as to "enabling data" "rests on evidence that should not have been admitted." Appellant's Br. 42 (arguing that McAlexander improperly testified beyond the scope of his expert report). But this argument too fails because, as discussed, the district court did not abuse its discretion in permitting the challenged testimony. And here, Mr. McAlexander testified, for example, that the "enabling data" limitation is met by "scripts that are downloaded [to the LMUs]" that "include the instructions and the data necessary to be able to make the determination as to ... which bus is being discovered and what units are on that bus." J.A. 23535; *see also* J.A. 23529–31 (McAlexander describing "scripts" that "inform[ ] the LMU device how it is to operate" as "enabling data"). Accordingly, we conclude that

Mr. McAlexander's testimony constitutes sufficient evidence for the jury to find the "enabling data" limitation met.

[12]  CalAmp also argues that the jury's infringement finding as to the 278 patent was impermissibly tainted by Omega's "improper 'device code' theory." Appellant's Br. 37. CalAmp suggests that "the jury found the required 'corresponding vehicle device code' to be what Omega improperly identified as the 'stored device code' that originates at the LMU itself." Appellant's Br. 39. It is undisputed that the LMU is not a vehicle device. *See, e.g.*, J.A. 23554 (McAlexander testifying that "the LMU is not a vehicle device"). Although CalAmp argues that Omega presented this improper theory to the jury during closing argument, Appellant's Br. 28, CalAmp does not contend that it "object[ed] on this ground, nor did it ask for a limiting instruction, so the objection to the closing argument is waived." *Haygood v. Auto-Owners Ins. Co.*, 995 F.2d 1512, 1517 (11th Cir. 1993). CalAmp also does not assert that it objected to the evidence Omega presented in support of this theory, so that objection is also "waived." *Carter v. DecisionOne Corp.*, 122 F.3d 997, 1004–05 (11th Cir. 1997) (first citing Fed. R. Evid. 103(a)(1); and then citing *Wilson v. Attaway*, 757 F.2d 1227, 1242 (11th Cir. 1985)).

[13]  Moreover, the jury was clearly instructed that "the accused LMUs ... are not vehicle devices[,] but the Engine Control Unit or ECU is a vehicle device." J.A. 45. A "jury is presumed to follow jury instructions." *Pensacola Motor Sales Inc. v. E. Shore Toyota, LLC*, 684 F.3d 1211, 1224–25 (11th Cir. 2012) (quoting *Adams v. Wainwright*, 709 F.2d 1443, 1447 (11th Cir. 1983)).

As explained above, there was sufficient evidence for the jury to find the "corresponding vehicle device code" limitation of the 278 patent met—namely, by signals from the ECU. And this evidence is independent from Omega's "stored device code" presentation at trial that CalAmp **\*1373** complains was improper. *See supra*. Given the instruction, we must assume the jury verdict rested on a proper theory.

### C. *JMOL or a New Trial as to Infringement*

We view CalAmp's arguments for a new trial on infringement of the 278 patent as coextensive with its arguments that CalAmp is entitled to JMOL of no infringement. *See, e.g.*, Appellant's Br. 38, 42. As discussed, we reject those

arguments. Accordingly, we affirm the district court's denial of JMOL and a new trial as to CalAmp's infringement of the asserted claims of the '278 patent.

### III. DAMAGES

CalAmp appeals the district court's denial of a new trial on damages for CalAmp's infringement of the '278 patent on two separate grounds: (1) that the district court erroneously precluded CalAmp's damages expert, Dr. DeForest McDuff, from testifying in rebuttal; and (2) that Omega's damages theory is legally flawed, leaving the jury's award unsupported by the record. We review the district court's denial of a motion for new trial for abuse of discretion. *Hicks*, 870 F.3d at 1257. We discuss each issue in turn and conclude that the district court abused its discretion as to each of the two issues in denying CalAmp's motion for a new trial on damages.[5]

### A. *Exclusion of Dr. McDuff*

[14] CalAmp argues that a new trial on damages for infringement of the '278 patent is warranted because under the law of the case Dr. McDuff is not barred from testifying and because the district court abused its discretion in precluding Dr. McDuff from offering rebuttal testimony as to damages in the retrial. We agree.

In each of the two trials, the district court precluded Dr. McDuff from testifying at all. Before the first trial, the district court granted Omega's *Daubert* motion to exclude Dr. McDuff. J.A. 5497. After the first trial, CalAmp moved for a new trial on damages on the basis that the district court "erroneously excluded Dr. McDuff's opinions in their entirety ... despite only identifying criticisms of Dr. McDuff's affirmative calculation of what a reasonable royalty should be." J.A. 17913. CalAmp argued that the court therefore improperly precluded CalAmp "from presenting its expert's criticism of Omega's damages analysis," i.e., rebuttal testimony. J.A. 17913. The district court denied CalAmp's motion because "CalAmp did not seek reconsideration of the [c]ourt's [*Daubert*] [o]rder to allow Dr. McDuff to testify [in rebuttal]" and found that CalAmp's opportunity to object to the exclusion of Dr. McDuff "has been waived." J.A. 18509. CalAmp did not raise the issue of the exclusion of Dr. McDuff's testimony (in principal or in rebuttal)

in the first appeal. But in that appeal, we vacated the compensatory damages award and remanded for a new trial, with instructions to the parties "to achieve clarity by clearly presenting evidence ... as to ... compensatory damages ... so that this court may effectively fulfill its appellate function in any further review **\*1374** arising from the retrial." *Omega Pats.*, 920 F.3d at 1354. CalAmp subsequently moved for "clarification" that Dr. McDuff would be permitted to offer damages testimony in rebuttal in the retrial based on our instructions. J.A. 19125–27. The district court denied CalAmp's motion, again on the basis that the district court's *Daubert* order before the first trial excluding Dr. McDuff "was not appealed." J.A. 19261.

[15] [16] The issue here is whether the district court properly applied the law-of-the-case doctrine in view of our mandate following the first appeal to our court. The "law of the case" is "a procedural matter not unique to patent law" to which we apply "the precedent of the regional circuit in which the case arose"—here, the Eleventh Circuit. *Exxon Corp. v. United States*, 931 F.2d 874, 877 n.4 (Fed. Cir. 1991). Applying Eleventh Circuit law, we review the district court's application of the law-of-the-case doctrine de novo. *Alphamed, Inc. v. B. Braun Med., Inc.*, 367 F.3d 1280, 1285 (11th Cir. 2004).

[17] [18] [19] "The mandate rule provides that 'issues actually decided [on appeal]—those within the scope of the judgment appealed from, minus those explicitly reserved or remanded by the court—are foreclosed from further consideration.' " *Amado v. Microsoft Corp.*, 517 F.3d 1353, 1360 (Fed. Cir. 2008) (alteration in original) (quoting *Engel Indus., Inc. v. Lockformer Co.*, 166 F.3d 1379, 1383 (Fed. Cir. 1999)). "We review the district court's interpretation of our mandate de novo under Federal Circuit law." *Metso Mins. Inc. v. Terex Corp.*, 594 F. App'x 649, 651 (Fed. Cir. 2014) (citing *TecSec, Inc. v. Int'l Bus. Machs. Corp.*, 731 F.3d 1336, 1341 (Fed. Cir. 2013)); *see Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.*, 576 F.3d 1348, 1355–56 (Fed. Cir. 2009); *Engel*, 166 F.3d at 1382; *Laitram Corp. v. NEC Corp.*, 115 F.3d 947, 950–51 (Fed. Cir. 1997). In interpreting this court's mandate, "both the letter and the spirit of the mandate must be considered." *Engel*, 166 F.3d at 1383.

On remand, we explicitly instructed both parties "to achieve clarity by clearly presenting evidence [in the retrial] ... as to ... compensatory damages ... so that this court may effectively

fulfill its appellate function in any further review arising from the retrial." *Omega Pats.*, 920 F.3d at 1354; *see id.* at 1349–51 (declining to decide evidentiary issues with respect to compensatory damages and remanding for a new trial). This instruction to the parties necessarily implied that the district court was "to consider damages consistent with the principles set forth in the opinion," including by reconsidering prior orders regarding evidence of damages. 🚩*Bluebonnet Sav. Bank, F.S.B. v. United States*, 339 F.3d 1341, 1346 (Fed. Cir. 2003) (per curiam). Moreover, in our view, the "spirit of the mandate" permitted the district court to reconsider any evidentiary rulings that might be seen in a different light at the retrial. *See Engel*, 166 F.3d at 1383.

Here, the issue of Dr. McDuff's rebuttal testimony (and our remand instruction) was timely raised by CalAmp before the retrial. *See* J.A. 19125–28. On remand, the district court simply held that Dr. McDuff was precluded from testifying in rebuttal because "the admissibility of Dr. McDuff was decided [before the first trial]" and because that "decision is final" and "was not appealed." J.A. 19261. This decision was contrary to our mandate and opinion. *See* 🚩*Bluebonnet*, 339 F.3d at 1346 ("We did not intend for our mandate to foreclose the trial court from conducting any further inquiry into the proper amount of the damages to be awarded in this case.").

**\*1375** **[20]** **[21]** **[22]** A "district court's actions on remand should not be inconsistent with either the letter or the spirit of the mandate." 🚩*Laitram*, 115 F.3d at 951. Accordingly, to the extent the district court precluded Dr. McDuff from testifying in rebuttal in the retrial on the basis that it was bound by its evidentiary ruling in the first trial,[6] that was legal error.

**[23]** We recognize that our instruction in the first appeal left the district court with discretion as to evidentiary rulings in the retrial. *See Seamon*, 813 F.3d at 987. But when the dispositive issue is whether the district court misinterpreted our mandate, "no deference is due." 🚩*Laitram*, 115 F.3d at 950.

Regardless, to the extent the district court did exercise its discretion, we conclude that it was an abuse of discretion to preclude Dr. McDuff from testifying in rebuttal in the retrial. Omega's 🚩*Daubert* motion before the first trial to exclude Dr. McDuff did not challenge his qualifications to testify regarding damages in this case or his critique of

Omega's expert's comparable-license analysis. *See* J.A. 867–84, 5488–97. Indeed, leading up to the retrial, the district court confirmed that Dr. McDuff "was qualified" and that "[t]he issue of whether [Dr. McDuff] was challenging plaintiff's damages expert was really not directly addressed in the [🚩*Daubert*] motions or the order." J.A. 19260. In other words, the issue of Dr. McDuff's rebuttal testimony was never addressed (or challenged) on the merits. Moreover, Dr. McDuff's critiques of Omega's damages expert were disclosed in Dr. McDuff's expert report submitted before the first trial, *see* Report of DeForest McDuff, Ph.D. (excerpts), *Omega Pats., LLC v. CalAmp Corp.*, No. 13-cv-1950, 2017 WL 4391904 (M.D. Fla. May 22, 2017), ECF No. 216-23, and CalAmp timely moved for permission to call Dr. McDuff in rebuttal before the retrial, *see* J.A. 19125–28. We discern no basis for the district's court ruling to preclude Dr. McDuff from testifying in rebuttal in the retrial (other than erroneously adhering to its prior ruling). Accordingly, we conclude that the district court abused its discretion. 🚩*Klay v. United Healthgroup, Inc.*, 376 F.3d 1092, 1096 (11th Cir. 2004) ("A district court may ... abuse its discretion by applying the law in an unreasonable or incorrect manner.").

Omega's contrary arguments are unpersuasive. First, Omega relies on our decision in 🚩*Tronzo v. Biomet, Inc.*, 236 F.3d 1342 (Fed. Cir. 2001), for the proposition that "CalAmp waived the district court's decision to exclude Dr. McDuff" by "not appeal[ing] that decision as part of the first appeal to this Court." Cross-Appellant's **\*1376** Br. 52. 🚩*Tronzo* does not help Omega. In 🚩*Tronzo*, we held that the mandate in question acted to prevent reconsideration of the issue of punitive damages on remand because in the first appeal the defendant "chose not to contest the amount of punitive damages" and our remand only concerned compensatory damages. 🚩236 F.3d at 1345, 1349. Here, in contrast to the unchallenged punitive damages award in 🚩*Tronzo*, CalAmp did contest compensatory damages in the first appeal. Moreover, in 🚩*Tronzo*, the mandate in question "left it to the district court to decide, at its discretion, whether it would be appropriate to take new evidence" on remand as to the category of damages that was remanded. 🚩*Id.* at 1345. Accordingly, 🚩*Tronzo* does not suggest a different outcome here.

Second, Omega contends that CalAmp is barred from presenting Dr. McDuff's testimony in rebuttal based on CalAmp's representation prior to the retrial that CalAmp "will treat issues actually resolved by the [district] [c]ourt at the first trial—and not appealed or otherwise impacted by the Federal Circuit's opinion and remand—as final." Cross-Appellant's Br. 52–53 (quoting J.A. 19132). But as discussed, the issue of Dr. McDuff's rebuttal testimony was "impacted" by our opinion in the first appeal. Therefore, this representation by CalAmp is of no import here.

In sum, we conclude that a new trial on damages for infringement of the '278 patent is warranted because the district court abused its discretion in precluding Dr. McDuff from offering his fully disclosed rebuttal testimony in the retrial, and in denying CalAmp's motion for a new trial on that basis.

### B. Apportionment

Ultimately, a new trial on damages is warranted. The jury awarded a $5.00-per-unit royalty for CalAmp's infringement of the '278 patent. CalAmp argues that the $5.00 figure does not reflect apportionment and that Omega failed to show the incremental value of the '278 patent (or that the patented improvement drove demand for the entire accused product), rendering the jury's damages award unsustainable. We agree.

 **[24]  [25]  [26]  [27]  [28]** "[T]he patentee must in every case give evidence tending to separate or apportion ... the patentee's damages between the patented feature and the unpatented features ...." *LaserDynamics, Inc. v. Quanta Comput., Inc.*, 694 F.3d 51, 67 (Fed. Cir. 2012) (cleaned up). Accordingly, where a royalty is at issue, "[n]o matter what the form of the royalty, a patentee must take care to seek only those damages attributable to the infringing features." *VirnetX, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1326 (Fed. Cir. 2014). And "where multi-component products are involved, the governing rule is that the ultimate combination of royalty base and royalty rate must reflect the value attributable to the infringing features of the product, and no more." *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1226 (Fed. Cir. 2014). In other words, "[w]hen the accused infringing products have both patented and unpatented features, measuring this value requires a determination of the value added by such features." *Id.*

It follows that "a patentee may assess damages based on the entire market value of the accused product only where the patented feature creates the basis for customer demand or substantially creates the value of the component parts." *VirnetX*, 767 F.3d at 1326 (cleaned up).

 **[29]  [30]** We have, however, explained that "when a sufficiently comparable license **\*1377** is used as the basis for determining the appropriate royalty, further apportionment may not necessarily be required." *Vectura Ltd. v. Glaxosmithkline LLC*, 981 F.3d 1030, 1040 (Fed. Cir. 2020). "That is because a damages theory that is dependent on a comparable license (or a comparable negotiation) may in some cases have 'built-in apportionment.' " *Id.* "Built-in apportionment effectively assumes that the negotiators of a comparable license settled on a royalty rate and royalty base combination embodying the value of the asserted patent." *Id.* at 1041. For built-in apportionment to apply the license must be "sufficiently comparable" in that "principles of apportionment were effectively baked into" the purportedly comparable license. *Id.*; *see Commonwealth Sci. & Indus. Rsch. Organisation v. Cisco Sys., Inc.*, 809 F.3d 1295, 1303 (Fed. Cir. 2015). The patentee has the burden of proving damages, *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1324 (Fed. Cir. 2009), and where licenses are at issue, that includes "the burden to prove that the licenses were sufficiently comparable," *id.* at 1329; *see ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 872 (Fed. Cir. 2010).

 **[31]** Here, Omega first contends that it did not need to show apportionment at all because "[t]he jury heard [that] the infringing LMUs have no component parts outside what is found in the '278 patent" and that "[e]ach of these LMU components [is] found in the infringed claims of the '278 patent." Cross-Appellant's Br. 35–36. We disagree with Omega as a matter of law. *See Exmark Mfg. Co. v. Briggs & Stratton Power Prods. Grp., LLC*, 879 F.3d 1332, 1348 (Fed. Cir. 2018). In *Exmark*, the asserted claim was directed to a lawn mower as a whole and covered the entire infringing lawn-mower product. *Id.* We held that the patent owner was still required to "apportion or separate the damages between the patented improvement and the conventional components of the multicomponent product" to ensure that the patent owner was "compensated for the

patented improvement (i.e., the improved flow control baffle) rather than the entire mower." *Id.* Accordingly, here, even if the LMUs have the same components as those set forth in the asserted claims, Omega still must "adequately and reliably apportion[ ] between the improved and conventional features of the accused [product]" when using the LMUs "as a royalty base." *Id.*; *see* *Commonwealth, 809 F.3d at 1301.* We therefore reject Omega's contention that it was not required to show apportionment simply because the jury heard testimony that the LMUs have no component parts outside what is claimed in the '278 patent. As we discuss below, there is no question that the LMUs have conventional components that are not the inventive aspects of the '278 patent.

 [32]  Turning to the merits of apportionment, we conclude that Omega did not present sufficient evidence to the jury to sustain its damages award for infringement of the asserted claims of the '278 patent. First, Omega failed to show that its patented improvement drove demand for the entire LMU product. Second, in the alternative, [7] Omega failed to show the incremental value that its patented improvement added to the LMU product as apportioned **\*1378** from the value of any conventional features. We further address each issue in turn.

As to demand for the entire LMU product, Omega argues that "[a] reasonable jury could have concluded ... [that] the infringing LMU sales were driven primarily, if not exclusively, by the invention of the '278 patent and determined to apportion minimal, if any, value to any other characteristics," Cross-Appellant's Br. 36, in that "a reasonable jury could have concluded that the multivehicle compatibility feature was worth anywhere from almost the entire profit of the product, to \$7.00, to \$6.26, or the \$5.00 value that the jury ultimately awarded," Cross-Appellant's Br. 38. [8] We disagree.

According to the record, additional features of the LMUs include, for example, a "3-axis accelerometer," the ability to "detect hard braking, cornering[,] or acceleration," and an "industry leading on-board alert engine." J.A. 21425–26. It is undisputed that these features are not inventive aspects of the asserted claims of the '278 patent. As another example, it is undisputed that CalAmp's VPOD units provide functionality that overlaps with a subset of the functionality of the LMUs, *see, e.g.*, J.A. 23473, and this functionality was found *not* to infringe any claim of the '278 patent (a finding Omega did not appeal), *see* J.A. 30–31. Omega nonetheless argues

that the multi-vehicle-compatibility feature of the LMUs "primarily, if not exclusively" drove sales. Cross-Appellant's Br. 36. But Omega failed to present sufficient evidence to the jury that this feature "create[d] the basis for customer demand or substantially create[d] the value of the component parts." *VirnetX, 767 F.3d at 1326* (cleaned up). Rather, Omega merely points to lesser testimony, for example, that multivehicle compatibility would be "an important feature," J.A. 19650, or "a helpful feature," J.A. 23582, and that development of the LMUs "was driven by a general market need," J.A. 19634. Omega further points to testimony that multivehicle compatibility increased the value of the LMUs, *see* Cross-Appellant's Br. 32, but this testimony goes on to explain that the LMUs would still have had value absent this feature, *see* J.A. 19622. In sum, we conclude that the jury could not reasonably have found that the multi-vehicle-compatibility feature of the LMUs drove demand for the entire LMU product. [9] *See* *LaserDynamics, 694 F.3d at 68* ("It is not enough to merely show that the [patented improvement] is viewed as valuable, important, or even essential to the use of the [accused product].").

Omega is therefore left with its comparable-licenses theory, which depends on built-in apportionment. According to Omega, "[w]ith evidence of Omega's licensing program[ ]" and "details of the licenses" introduced at trial, "there was sufficient evidence" for the jury to determine a reasonable **\*1379**  royalty of \$5.00 per unit. Cross-Appellant's Br. 31. We disagree.

Omega's president, Mr. Flick, testified that under Omega's licensing program the licensing fee was "five dollars [per unit] whether it's one patent or 50 patents." J.A. 23324. Mr. Flick further testified that "[no] particular patent [is] treated as more valuable than another" and that Omega's policy was "one price for all." J.A. 23324–25. In other words, for "five dollars" per unit a licensee "got every[thing] – no matter what [the licensee] did, the first patent's five bucks. Everything else thereafter [Omega] just threw ... in." J.A. 23324.

Indeed, on appeal, Omega maintains that Mr. Flick's testimony "did not distinguish between data bus patents for royalty purposes, all of which were licensed for \$5.00 or more per unit. Cross-Appellant's Br. 47–48. Omega nonetheless argues that a reasonable jury could have awarded a royalty of \$5.00 per unit based on Mr. Flick's testimony. *See* Cross-Appellant's Br. 38. We disagree. Omega's theory would permit it to obtain a particular royalty rate merely by relying on

its internal "policy" without regard to comparability—under the proffered licensing arrangement, Omega sought the same licensing fee *regardless* of what patents were included or what technology was covered. Put differently, Mr. Flick's testimony does not sufficiently speak to "built-in apportionment" between the patented improvement added to the LMUs and the conventional features of the LMUs. *See* 🔖 *Vectura*, 981 F.3d at 1040 (explaining that "built-in apportionment" relies on "a comparable license" or "comparable negotiation"). To hold otherwise would improperly permit Omega to hide behind its generic licensing arrangement to avoid the task of apportionment. *See* 🔖 *LaserDynamics*, 694 F.3d at 79 ("[T]o prove a reasonable royalty, alleging a loose or vague comparability between different technologies or licenses does not suffice.").

Although a closer call, we likewise conclude that Omega failed to show built-in apportionment based on the license agreements presented to the jury. At trial, Omega introduced eighteen license agreements. *See* Cross-Appellant's Br. 30 n.4 (listing the agreements); *see also* J.A. 22185–22439. Omega argues that "the licenses reveal devices that connect to the data bus with the multi-vehicle functionality found in the '278 patent [and] generally carry a royalty at a rate of at least $5.00 per unit." Cross-Appellant's Br. 45. Omega's fundamental problem is that it failed to show that these agreements attributed a $5.00-per-unit royalty to the value of the '278 patent.

 **[33]**   For starters, despite proposing a royalty of $6.26 per unit, Omega's damages expert, Christian Tregillis, testified that "whether it's one patent or all the patents, the way that Omega licenses them is, it's five bucks" and "[t]hat's the market rate for the data bus patents, be it one or two or three or four or 30." J.A. 23587. Further walking away from apportionment (and relying on Omega's licensing arrangement), Mr. Tregillis testified that "CalAmp should pay the same rate no matter how many claims or how many of the patents it infringes." J.A. 23595. But absent evidence of a comparable license or comparable negotiation to support an identical $5.00 rate for a one-patent license to the '278 patent, we fail to see how this patent/claim-independent approach accounts for apportionment. [10] *See* 🔖 *AstraZeneca AB v. Apotex Corp.*, 782 F.3d 1324, 1338 (Fed. Cir. 2015) **\*1380** ("When a patent covers the infringing product as a whole, and the claims recite both conventional elements and unconventional elements, the court must determine how to account for the relative value of the patentee's invention in comparison to the value of the conventional elements recited in the claim, standing alone."); 🔖 *Ericsson*, 773 F.3d at 1226 ("[T]he ultimate reasonable royalty must be based on the incremental value that the patented invention adds to the end product.").

Omega suggests that Mr. Tregillis offered such testimony because of purported most-favored-nation clauses in some Omega licenses that ostensibly would have required Omega to reduce rates for other licensees had it charged CalAmp less than $5.00 per unit through a hypothetical negotiation, therefore indicating that Omega would not have accepted less than $5.00 per unit from CalAmp. *See* Cross-Appellant's Br. 38–39; J.A. 23997. This argument is without merit. Mr. Tregillis explicitly testified that the relevant most-favored-nation clauses would not be triggered unless "two licenses have ... comparable sales volumes, payment terms, and distribution channels" and that he "performed no analysis of those factors." J.A. 23616–17. Omega simply has not pointed to evidence that any of the relevant most-favored-nation clauses would be implicated by a one-patent license to CalAmp at a rate of less than $5.00 per unit.

 **[34]**   We recognize that one or more of the license agreements introduced at trial by Omega could, in theory, provide a basis for a reasonable royalty if the license rate were properly apportioned. Indeed, at least two of the agreements included the '278 patent. *See* J.A. 22195–204 ("Cimble Agreement"); J.A. 22227–36 ("Accele Agreement"). Moreover, "allegedly comparable licenses may cover more patents than are at issue in the action, include cross-licensing terms, [or] cover foreign intellectual property rights." 🔖 *Ericsson*, 773 F.3d at 1227. But Omega was nonetheless required to "account for such distinguishing facts when invoking [the licenses] to value the patented invention." 🔖 *Id.*; *see* ⚠️ *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1317 (Fed. Cir. 2011) ("[T]here must be a basis in fact to associate the royalty rates used in prior licenses to the particular hypothetical negotiation at issue in the case.").

Here, we conclude that Omega failed to adequately account for substantial "distinguishing facts" between the proffered licenses and a hypothetical negotiation over a single-patent license to the '278 patent. Most glaringly, each of the eighteen proffered licenses involves numerous patents, in contrast to a hypothetical negotiation for a single-patent license. For example, the Cimble Agreement covers thirty-nine U.S. patents, twelve foreign patents, and three patent

applications, and the Accele Agreement covers twenty-four U.S. patents, nine foreign patents, and twelve patent **\*1381** applications. [11] J.A. 22203–04, 22235–36. Omega argues that "Mr. Tregillis addressed the fact that some licenses cover more than the ʼ278 patent" and "accounted for the additional patents found in the existing licenses." Cross-Appellant's Br. 46 (citing J.A. 23571–72, 23586). But the testimony cited by Omega reveals that Mr. Tregillis merely *identified* such differences—Mr. Tregillis simply testified that the licenses "cover multiple patents that are even beyond the patents in the hypothetical negotiation," J.A. 23571, and that the licenses contain a "long list of patents," J.A. 23586. What's utterly lacking is evidence that Omega met its obligation to "account for such distinguishing facts" in invoking the licenses to value the ʼ278 patent. *Ericsson*, 773 F.3d at 1227.

Omega separately suggests that it met its obligation to account for distinguishing facts on the basis that Mr. Flick "described the details, similarities[,] and differences between and among the licenses." Cross-Appellant's Br. 30. But, like his testimony regarding Omega's licensing arrangement, Mr. Flick merely testified, for example, that certain licenses included a royalty of $5.00 per unit regardless of "which patent" was included because "no patent was any more valuable than the others." J.A. 23326–27 (discussing the Audiovox Agreement). The Audiovox Agreement, like each of the others, covers numerous patents, unlike a hypothetical negotiation over only the ʼ278 patent. Mr. Flick's (and Mr. Tregillis's) generic testimony simply does not "account[ ] for the technological and economic differences between th[e] licenses" and a hypothetical negotiation over a single, specific patent. *ResQNet.com*, 594 F.3d at 873; *Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1211 (Fed. Cir. 2010) ("[U]se of past patent licenses ... must account for differences in the technologies and economic circumstances of the contracting parties."). Accordingly, we conclude that Omega did not present to the jury "a basis in fact to associate the royalty rates used in prior licenses to the particular hypothetical negotiation at issue in th[is] case." [12] *Uniloc*, 632 F.3d at 1317.

Omega also argues that the jury's award of only $1.00 for a single unit found to **\*1382** infringe the ʼ727 patent, compared with the jury's award of $5.00 per unit for infringement of the ʼ278 patent, is "compelling evidence" that "the jury found ... that the value of the two inventions w[as] significantly different or more closely replicated the circumstances of certain licenses and not others." Cross-Appellant's Br. 40. To the extent that Omega is arguing that the differing awards show that Omega presented sufficient evidence of apportionment with respect to the ʼ278 patent, we disagree. What the jury did (or did not) award with respect to the ʼ727 patent (which is not on appeal) does not excuse Omega from its obligation to show apportionment as to the ʼ278 patent.

We have considered Omega's remaining arguments with respect to damages but find them unpersuasive. In sum, we conclude that Omega failed to present sufficient evidence to the jury to support the jury's damages award for infringement of the asserted claims of the ʼ278 patent. We therefore conclude that the district court abused its discretion in denying CalAmp's request for a new trial and that a new trial on damages for infringement of the ʼ278 patent is warranted.

### IV. OMEGA'S CROSS-APPEAL

Omega cross-appeals the district court's determination of an ongoing royalty of $5.00 per unit infringing the ʼ278 patent. Because the district court's determination of the ongoing royalty rate was based on the jury's damages award for infringement of the ʼ278 patent, *see* J.A. 14–22, and because we vacate that damages award and remand for a new trial, the issues raised in Omega's cross-appeal are moot as to this appeal. We therefore dismiss the cross-appeal.

### CONCLUSION

For the above reasons, we vacate the jury's finding of direct infringement of the asserted claims of the ʼ885 patent, affirm the judgment of infringement of the asserted claims of the ʼ278 patent, vacate the jury's damages award for infringement of the ʼ278 patent and remand for a new trial on damages consistent with this opinion, and dismiss the cross-appeal.

**AFFIRMED-IN-PART, VACATED-IN-PART, AND REMANDED**

### COSTS

No costs.

Hughes, Circuit Judge, joining in part and dissenting in part. Although I agree with the majority regarding infringement, I conclude that the district court properly excluded CalAmp's damages expert on retrial and that the evidence presented by Omega constituted sufficient evidence to support the jury's finding of a five dollar per product royalty for infringement of the '278 patent. I therefore respectfully dissent from Parts III and IV of the majority opinion and from the judgment. I join the remainder of the majority opinion.

I

As the majority notes, before the first trial, the district court granted Omega's 🚩 *Daubert* motion to exclude CalAmp's damages expert, Dr. DeForest McDuff. Maj. Op. at 1373. After the first trial, CalAmp moved for a new trial on damages, arguing in part that the district court erred in excluding the entirety of Dr. McDuff's testimony. The district court denied the motion. And CalAmp did not raise that issue in its first appeal to this court. *Id.*

Not surprisingly, our prior opinion in this appeal did not make any specific reference **\*1383** to the exclusion of Dr. McDuff's testimony. Rather, our opinion focused on claim construction and infringement. Because we held that only one claim of one patent was properly found to be infringed in the first trial, we remanded for a new trial on both infringement of the remaining claims and compensatory damages. We also found that the district court erred by preventing two CalAmp witnesses from testifying about issues related to induced and willful infringement, both of which were issues of expert testimony explicitly appealed by CalAmp. But nowhere did we instruct the district court to reconsider all of its prior evidentiary rulings, nor did our discussion of the damages issue mention the exclusion of Dr. McDuff's testimony. *See Omega Pats., LLC v. CalAmp Corp.*, 920 F.3d 1337, 1351–54 (Fed. Cir. 2019). Instead, we concluded with a general, blanket statement: "the parties are urged to achieve clarity by clearly presenting evidence, objections, arguments, and jury instructions as to direct and indirect infringement, compensatory damages, and willful infringement ... so that this court may effectively fulfill its appellate function in any further review arising from the retrial." *Id.* at 1354. This is the only statement this court made regarding instructions for retrial.

Given that CalAmp did not appeal the district court's prior 🚩 *Daubert* order excluding Dr. McDuff's testimony, and because our prior decision likewise failed to mention it, it is equally unsurprising that the district court refused to reconsider that issue on remand. As the district court stated, "[t]he decision on the admissibility of Dr. McDuff was decided at docket entry 117 by me. That decision is final. It was not appealed. And that will not be revisited at this time." J.A. 19261. The majority appears to suggest that the district court legally erred because it believed "it was bound by its evidentiary ruling in the first trial." Maj. Op. at 1374–75. I respectfully disagree with that assessment. Rather, the district court exercised its discretion not to revisit an evidentiary ruling made in the first trial and not appealed by CalAmp in its first appeal.

Nor do I believe that the district court abused its discretion in refusing to reconsider an unappealed evidentiary issue. Under Eleventh Circuit law, evidentiary issues such as these are largely within the district court's discretion. *Seamon v. Remington Arms Co.*, 813 F.3d 983, 987 (11th Cir. 2016). And we should be even more wary of finding abuse of discretion for refusal to reconsider an issue that was not even raised in the first appeal, when CalAmp was clearly aware of the issue and its potential impact on any retrial. CalAmp presented its arguments in support of Dr. McDuff's testimony in its first motion for a new trial. J.A. 17913 ("[T]he Court erroneously excluded Dr. McDuff's opinions in their entirety, despite only identifying criticisms of Dr. McDuff's affirmative calculation of what a reasonable royalty should be. Dr. McDuff's report also included opinions criticizing the opinions of Omega's damages expert Christian Tregillis." (citation omitted)); *see also* J.A. 19260. CalAmp could have raised this issue in its first appeal, when it appealed the district court's denial of its first motion for a new trial. It did not do so. And I see no abuse of discretion in the district court's denial of CalAmp's request to re-litigate these arguments at retrial.

II

I disagree with the majority's apportionment analysis for two reasons. First, to the extent CalAmp contests the testimony of **\*1384** Omega's expert, Christian Tregillis, and the licenses introduced as comparable, both of these arguments more properly should have been made via 🚩 *Daubert* motion or objection at trial. Second, to the extent the majority requires

further accounting for the incremental value of the '278 patent beyond that reflected in the licenses introduced as comparable, I believe that approach is too restrictive given our precedent.

### A

CalAmp's arguments about the methodology of Omega's expert, Christian Tregillis, and the comparability of the licenses should have been made via *Daubert* motion and objection to the admission of the licenses at trial. *See MLC Int'l Prop. LLC v. Micron Tech., Inc.,* No. 2020-1413, 10 F.4th 1358, 1374–75 (Fed. Cir. Aug. 26, 2021) (affirming district court's *Daubert* order excluding expert testimony regarding a reasonable royalty); *Apple Inc. v. Motorola, Inc.,* 757 F.3d 1286, 1314 (Fed. Cir. 2014) ("[A] district court judge, acting as a gatekeeper, may exclude evidence if it is based upon unreliable principles or methods, or legally insufficient facts and data."), *overruled on other grounds by Williamson v. Citrix Online, LLC,* 792 F.3d 1339 (Fed. Cir. 2015). Incomparable agreements should not be admitted as evidence. *See, e.g., LaserDynamics, Inc. v. Quanta Comput., Inc.,* 694 F.3d 51, 78 (Fed. Cir. 2012) ("Accordingly, we conclude that the district court abused its discretion by admitting the ... settlement agreement into evidence, and must exclude the agreement from the proceedings on remand."). And when an expert's proffered royalty rate is "untethered from the patented technology at issue" such testimony should not be admitted. *Id.* at 81.

But CalAmp made no *Daubert* objections to any of Mr. Tregillis's testimony. Oral Argument (May 6, 2021) at 11:58–12:12, *available at* http://oralarguments.cafc.uscourts.gov/default.aspx?fl=20-1793_05062021.mp3 (Q: "Did you ever exclude the other side's expert witness under Daubert?" A: "I don't think we tried to exclude the other side's expert."); J.A. 23564. Nor did CalAmp object to the admission of the licenses that it argues are incomparable. *See* J.A. 23298, 23299, 23303, 23314, 23317, 23322, 23326, 23328, 23330, 23331, 23335, 23337, 23341, 23343, 23344, 23345. To the extent CalAmp believed Mr. Tregillis's testimony and the license agreements at issue "cannot support the jury's award," Appellant's Br. 56, it should have attempted to have them excluded at the *Daubert* stage or during trial. Its failure

to do so means that the testimony and licenses are evidence capable of supporting the damages award.

### B

I further disagree with the majority's view that the licenses introduced as comparable did not sufficiently account for the incremental value of the '278 patent. The majority's approach is, in my view, overly rigid and impermissibly limits the manner in which damages may be calculated in patent infringement cases. "A jury's damages award 'must be upheld unless the amount is grossly excessive or monstrous, clearly not supported by the evidence, or based only on speculation or guesswork.' " *Bio-Rad Lab'ys, Inc. v. 10X Genomics Inc.,* 967 F.3d 1353, 1373 (Fed. Cir. 2020) (quoting *Gen. Elec. Co. v. Joiner,* 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997)). At trial, the jury heard sufficient evidence to support both the comparability of the licenses and the award of a five dollar reasonable royalty.

**\*1385** 35 U.S.C. § 284 provides that "[u]pon finding for the claimant the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court." While the statute does not define "reasonable royalty," we have previously held that "[w]hen a 'reasonable royalty' is the measure, the amount may ... be considered a factual inference from the evidence, yet there is room for exercise of a common-sense estimation of what the evidence shows would be a 'reasonable' award." *Lindemann Maschinenfabrik GmbH v. Am. Hoist & Derrick Co., Harris Press & Shear Div.,* 895 F.2d 1403, 1406 (Fed. Cir. 1990). "[E]stimating a 'reasonable royalty' is not an exact science," and "the record may support a range of 'reasonable' royalties, rather than a single value." *Apple,* 757 F.3d at 1315. Indeed, "there may be more than one reliable method for estimating a reasonable royalty." *Id.*

"[P]arties frequently rely on comparable license agreements" to determine a reasonable royalty. *Bio-Rad,* 967 F.3d at 1372. "Assessing the comparability of licenses requires a consideration of whether the license at issue involves comparable technology, is economically comparable, and arises under comparable circumstances as the hypothetical

negotiation." *Id.* at 1372–73. But we have recognized that "[p]rior licenses ... are almost never perfectly analogous to the infringement action" and "may cover more patents than are at issue in the action, include cross-licensing terms, [or] cover foreign intellectual property rights." *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1227 (Fed. Cir. 2014).

Here, Mr. Tregillis testified that "whether it's one patent or all the patents, the way that Omega licenses them is, it's five bucks." J.A. 23587. And Kenneth Flick, Omega's president, testified that all of Omega's licensing agreements are structured so that the first data bus patent costs five dollars per device, and there is no charge for any additional data bus patents included in the agreement. J.A. 23324 ("[N]o matter what you did, the first patent's five bucks. Everything else thereafter, you just threw it in."). And nearly all of the licenses introduced by Omega and relied on by Mr. Tregillis value Omega's data bus patents at five dollars for the first licensed patent. *See, e.g.*, J.A. 22216, 22236, 22265, 22286, 22299, 22302, 22389, 22435, 22439. Because CalAmp did not object to Mr. Tregillis's or Mr. Flick's testimony or to the admission of the licenses at issue, to the extent that CalAmp found these licenses incomparable, it had the opportunity to address the issue on cross-examination. But once Mr. Tregillis's and Mr. Flick's testimony and the licenses were before the jury, the "'degree of comparability' was appropriately left for the jury to decide." *Bio-Rad*, 967 F.3d at 1357. And the jury was properly instructed that if it chose "to rely upon evidence from any other license agreements, [it] must account for any differences between those licenses and the hypothetically negotiated license between Omega and CalAmp, in terms of the technologies and economic circumstances of the contracting parties, when [it made its] reasonable royalty determination." J.A. 66.

In addition, where, as here, a party relied on a "hypothetical negotiation" approach and evidence of relevant licenses with other companies to support its suggested royalty rate, the majority's insistence on further apportionment unnecessarily forces a patent owner to make a specific business decision about how to license its patented technology at the outset, **\*1386** long before a patent infringement suit may even be contemplated. Had Omega relied on the value of the LMUs themselves to arrive at its estimation of a reasonable royalty rate, Omega would need to properly apportion the value of the LMUs from the value of the '278 patent. *See, e.g.*, *LaserDynamics*, 694 F.3d at 70–71 (affirming the district court's grant of a new trial on damages where

patent owner relied on entire market value rule to suggest a royalty rate without proving that the patented feature drove demand for the entire product). But Mr. Tregillis used the "hypothetical negotiation" for his calculation of reasonable royalty damages. J.A. 23567. "This approach attempts to calculate the royalty rate the parties would have agreed upon had they negotiated an agreement prior to the start of the infringement." *Bio-Rad*, 967 F.3d at 1372.

And given that the jury was properly instructed to consider the comparability of the license agreements in deciding on a reasonable royalty, I see no basis for overturning the jury's damages award based on a hypothetical negotiation theory and comparable license analysis. Mr. Tregillis relied on Omega's licensing policy and licensing agreements that reflect this policy to explain that whether a license included one data bus patent or several, five dollars per infringing unit was charged. Therefore, once a reasonable juror had concluded that the '278 patent was a data bus patent, she could have reasonably concluded from Mr. Tregillis's testimony, the licenses, and Mr. Flick's testimony that Omega would have hypothetically negotiated a five dollar per device license for the '278 patent. The majority's insistence on "evidence of a comparable license or comparable negotiation to support an identical $5.00 rate for a one-patent license to the '278 patent," Maj. Op. at 1379, effectively forecloses the idea that "there may be more than one reliable method for estimating a reasonable royalty," *Apple*, 757 F.3d at 1315.

Because I would uphold the jury's damages award of five dollars per unit infringing the '278 patent, I would also affirm the district court's determination of an ongoing royalty of five dollars per unit infringing the '278 patent.

III

I believe the district court did not abuse its discretion in precluding Dr. McDuff from offering his rebuttal testimony in the retrial. And I believe that the majority's insistence that further apportionment is necessary in this instance takes too narrow a position on what constitute comparable licenses. I therefore respectfully dissent from Parts III and IV of the majority opinion and from the judgment. I would affirm.

### All Citations

13 F.4th 1361

## Footnotes

\*      Circuit Judge Sharon Prost vacated the position of Chief Judge on May 21, 2021.

1      We did not affirm validity or infringement of original claims 1 and 10 of the ⚑'727 patent, which were abandoned during an ex parte reexamination.

2      The jury also awarded $1.00 for a single unit found to infringe amended claim 1 of the ⚑'727 patent, J.A. 32–33, and the district court added prejudgment interest, J.A. 1.

3      The only claim limitations of the ⚑'885 patent at issue here appear in claim 1, from which the other asserted claims depend.

4      The only claim limitations of the '278 patent at issue here appear in claim 1, as well as the other asserted independent claims, and the remaining asserted claims depend from these independent claims.

5      In the alternative, CalAmp appeals the district court's denial of remittitur. Because we agree with CalAmp that the district court abused its discretion in not ordering a new trial on damages, we need not and do not reach CalAmp's appeal in the alternative as to remittitur. Nor would it be appropriate to address remittitur here, considering the district court's improper exclusion of Dr. McDuff and the lack of evidence of apportionment, as discussed herein.

6      Ordinarily, under the Eleventh Circuit's law-of-the-case doctrine, "[a] legal decision made at one stage of the litigation, unchallenged in a subsequent appeal when the opportunity existed, becomes the law of the case for future stages of the same litigation, and the parties are deemed to have waived the right to challenge that decision at a later time." *United States v. Stein*, 964 F.3d 1313, 1324 (11th Cir. 2020) (quoting ⚑*United States v. Escobar-Urrego*, 110 F.3d 1556, 1560 (11th Cir. 1997)). But such waiver does not necessarily apply where, as here, the mandate permits consideration on remand of the otherwise-waived issue. *See, e.g.*, *Stein*, 964 F.3d at 1324 (explaining that whether the law of the case applies depends on "the scope of ... [the] remand"); *United States v. Mesa*, 247 F.3d 1165, 1171 n.6 (11th Cir. 2001) (noting that waiver may be overcome by the mandate on remand); ⚑*Baumer v. United States*, 685 F.2d 1318, 1321 (11th Cir. 1982) (recognizing that an issue not raised on appeal may nonetheless be litigated on remand depending on "the scope of th[e] mandate"). Our case law, which governs the interpretation of our mandates, contains a similar principle. *E.g.*, ⚑*Amado*, 517 F.3d at 1360.

7      Omega appears to argue both that it was not required to show apportionment based on what drove demand for the LMUs and that it did provide sufficient evidence for the jury to apportion the incremental value of the '278 patent. *See, e.g.*, Cross-Appellant's Br. 35–36. We consider these arguments as made in the alternative.

8      In support of this damages theory, Omega relied on CalAmp's supposed willingness to pay a royalty of $7.00 per unit for non-patented "multivehicle technology" from a third party, which is in the range of the $5.00 figure awarded by the jury. Cross-Appellant's Br. 37–38; *see* J.A. 19494. But Omega has identified no evidence that the third party's "multivehicle technology" is comparable to the invention of the '278 patent.

9      Moreover, Omega does not point to any meaningful evidence presented to the jury of "the entire market value" of the LMUs, *see* ⚑*VirnetX*, 767 F.3d at 1326, or "the entire profit of the product," *see* Cross-Appellant's Br. 38, further confirming that Omega failed to carry its burden here.

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

10      The dissent faults CalAmp for not attempting to exclude "Mr. Tregillis's testimony and the license agreements at issue" at the ⚑ *Daubert* stage or during trial and concludes that CalAmp's "failure to do so means that the testimony and licenses are evidence capable of supporting the damages award." Dissent 5. But CalAmp's "failure" to object does not decide the issue—"[f]ailure to object to admission of the evidence does not act as waiver as to a challenge to the sufficiency of the evidence for the jury to award damages." *Omega Pats., 920 F.3d at 1350 n.12* (citing ⚑ *Lucent Techs., 580 F.3d at 1325, 1335*). Indeed, ⚑ *Daubert* itself recognizes that a decision not to exclude evidence under Rule 702 does not foreclose a challenge to the sufficiency of evidence. ⚑ *Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 596, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)*.

11      As additional (uncomprehensive) examples, other license agreements introduced at trial include "the Numerex," "Audiovox, ADS, Fortin, and DEI" agreements. J.A. 23579; *see* J.A. 22392–22406 ("Numerex Agreement"); J.A. 22255–73 ("Audiovox Agreement"); J.A. 22275–87 ("ADS Agreement"); J.A. 22288–99 ("Fortin Agreement"); J.A. 22314–58 ("DEI Agreement"). The Numerex Agreement covers fifty-nine U.S. patents, nine foreign patents, and several patent applications (J.A. 22401–03); the Audiovox Agreement covers twelve U.S. patents and three foreign patents (J.A. 22264); the ADS Agreement covers eleven U.S. patents and three foreign patents (J.A. 22285); the Fortin Agreement covers ten U.S. patents and three foreign patents (J.A. 22298); and the DEI Agreement covers twenty-two U.S. patents, eleven foreign patents, and several patent applications (J.A. 22346).

12      We disagree with the dissent's odd suggestion that our opinion "unnecessarily forces a patent owner to make a specific business decision about how to license its patented technology at the outset" or "effectively forecloses the idea" that there may be multiple reliable methods for estimating a reasonable royalty. Dissent 7–8. Contrary to the dissent, the hypothetical negotiation is not constrained by the patentee's own licensing practices. Here, under the "hypothetical negotiation" approach, Omega failed to carry its burden to prove that the proffered licenses were sufficiently comparable to the hypothetical negotiation at issue because it did not account for substantial distinguishing facts.

---

**End of Document**                                                      © 2022 Thomson Reuters. No claim to original U.S. Government Works.